(No. 13815.—Reversed and remanded.)
RALPH McGRADY et al. Appellees, vs. OCELIA McGRADY
et al. Appellants.

*Opinion filed April 21, 1921—Rehearing denied June 10, 1921.*

1. WILLS—*what facts are not sufficient on which to base opinion of unsoundness of mind.* Opinions that the testator was of unsound mind are not founded upon sufficient basis where they rest solely upon evidence of the testator's weakened physical condition, on his disinclination to talk, on his statements that he was not satisfied with his will and that it was made by his wife and daughter, on his failure to recognize persons with whom he was acquainted, and on his mis-statement of the quantity of land he owned.

2. SAME—*will cannot be impeached merely because of injustice of its provisions.* Where the testator's mental capacity is an issue in a will contest case, it is proper for the jury to take into consideration the injustice, inequality or unreasonableness of the provisions of the will as a circumstance on the question of sanity, but the will cannot be impeached merely because of the injustice or impropriety of its provisions.

3. SAME—*testator has a right to make any lawful disposition of his property he may choose.* The law does not require that a testator be fair, just, kind or humane but only that he shall be of sound mind, and he has a right to make an unequal distribution of his property among his heirs or give it entirely to strangers.

4. SAME—*when verdict will be set aside as against preponderance of evidence.* In a will contest case the verdict of the jury and the decree of the chancellor, who heard and saw all the witnesses, must be given the weight to which they are entitled, but the decree must be reversed and the cause remanded where the verdict is manifestly against the great preponderance of the evidence.

APPEAL from the Circuit Court of Whiteside county; the Hon. FRANK D. RAMSAY, Judge, presiding.

JACOB CANTLIN, and L. T. STOCKING, for appellants.

H. H. WAITE, and H. C. WARD, for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

Barney McGrady died in April, 1920, at the age of seventy-four years. He left a widow, and his heirs were his sons, Ralph and Bert, his daughters, Pearl Landwair

and Florence Sollars, and his grand-daughter, Macie Houch, daughter of his deceased son, William. A will which he had executed on July 17, 1918, was admitted to probate, and all the heirs except Florence Sollars filed a bill against her and the widow to contest the will, alleging that the testator at the time of its execution was of unsound mind, and that Ocelia McGrady, his widow, and Florence Sollars, his daughter, induced him to execute it by undue influence. The issue whether the instrument was the last will and testament of Barney McGrady was tried by a jury. The question of undue influence was withdrawn from their consideration by the court and a verdict was returned finding that the instrument was not the will of the deceased. A motion for a new trial was overruled and a decree was entered setting aside the probate, from which the defendants have appealed. They rely for a reversal solely on the proposition that the verdict is manifestly against the weight of the evidence.

At the time of his death the testator owned a farm of 240 acres of land in Tampico township, in Whiteside county, worth $54,000, his residence in the village of Tampico, worth about $3000, and personal property worth about $3700. By the will he gave all of the property to his wife for life, with remainder upon her death in 120 acres of the farm, upon which were all the buildings, to Florence Sollars; in 40 acres to Ralph McGrady and in 20 acres to Bert McGrady, and in the house and lots in Tampico to Barney Sollars, a minor son of Florence. He directed Bert McGrady to pay the testator's grand-daughter, Macie Houch, $500, and Florence Sollars to pay $100 a year for fifteen years after the death of the widow to Pearl Landwair, provided that such payments should cease upon the death of Pearl. He directed that his personal property on the farm should be sold at public sale and the proceeds equally divided among his heirs. There was no residuary clause, and the remainder, after the death of the widow, in 60 acres of the farm was not disposed of.

It was stipulated by the parties at the beginning of the trial that the period of time following January 1, 1918, was the only period during which it was claimed that Barney McGrady was not of sound mind. In fact, there was no evidence even remotely tending to show any impairment of the testator's mental faculties until an illness of about four weeks' duration which he suffered in June and the first few days in July, 1918. He had lived in Tampico ten or twelve years before the execution of his will and before that time had lived on his farm, about five miles southwest of Tampico. At the time the will was executed he and his son-in-law, Leo Sollars, were conducting the farm in partnership. The testator was a soldier of the civil war and a member of the Grand Army post, of which he was officially quartermaster, though another officer had kept the books for thirteen years, collecting the money and turning it over to McGrady. He was also a member of the Masonic lodge, the Eastern Star and the White Shrine and regularly attended their meetings. He went down to the business part of the town regularly, getting his mail and calling frequently at various places of business, where he bought whatever supplies might be needed for his house or at the farm. He read the newspapers and talked with his acquaintances about current events, upon which he kept himself well informed, as well as past occurrences in which he had borne a part. He discussed prices and the market intelligently, and, as indicated by the stipulation and failure to introduce evidence to the contrary, was a man of at least ordinary mental capacity, whose mental vigor had not in any way abated at the time of his illness in June, 1918. That illness itself was not of a character to affect him mentally though it did reduce his physical powers. Dr. Terry, his physician, testified that he had attended McGrady daily, sometimes oftener, while he was confined to the house about four weeks, probably from June 10 to July 6 or 7. McGrady was not confined to the bed all the

time but was up and down all the time. He had inflammation of the bladder, which caused retention of the urine and had to be catheterized for a while twice a day. Dr. Terry went to the army on August 10 and did not give McGrady any treatment or medicine after July 17. He was of the opinion that McGrady was of sound mind. The testator was sick again in the spring of 1919. What the nature of his disease at that time was does not appear and is not important, as it was not of such a character as to throw any light upon what his condition was in July, 1918.

About fifty witnesses were examined on the trial. The testator's habits were such as to bring him in contact with a considerable number of his acquaintances frequently, but usually in a social rather than in a business way. As a retired farmer he had not a great deal of business to transact, but such as he had he continued to transact after his illness as he had before. There is no evidence of any business transaction to which he was unable to attend or which he did not understand, and there is evidence he transacted business sanely. The will was drawn by O. D. Olsson, who had been a justice of the peace in Tampico for sixteen years and had known the testator thirty years. He testified that McGrady came alone to his office, which was in his home, and said he wanted a will made; that Olsson got a blank and after he had started filling out the heading he asked McGrady what was next. The will was drafted according to McGrady's dictation and he took it away with him, unsigned. Olsson regarded him as of good, bright, sound mind. The attesting witnesses were Roy F. Nelson and L. W. Denison. Nelson was manager of the Farmers' elevator at Tampico and had known McGrady for fifteen or sixteen years. He testified that McGrady came over to the elevator office alone and asked him to come over and sign his will. They went to the Tampico Bank, and after McGrady had signed the will at the cashier's window Nelson and Denison also signed. No other member of the Mc-

Grady family was present and no one else except the employees of the bank. Denison was the cashier of the bank, and he testified to McGrady's coming in with Nelson and executing the will in the presence of Nelson and himself, who then signed as witnesses. The will was left at the bank, though Denison could not say exactly when, and after McGrady's death it was forwarded to the proper officer at Morrison, the county seat. Both these witnesses testified that McGrady was of sound mind. He had a checking account at the bank, in which he made deposits and on which he drew checks until his death. Nelson saw McGrady frequently in 1918 and 1919 and sold him clover seed each spring, which McGrady bought and paid for himself. They had frequent talks in the office when McGrady would come in and talk over the market reports. Nelson noticed a physical change in McGrady after his sickness in 1919 but no mental change. These witnesses knew the testator well.

Besides the above, many other witnesses testified that the testator was of sound mind,—witnesses who met him frequently,—one, two or three times a week,—not in the exchange of mere casual greetings but conversing with him in his home and in places of business, in social meetings and meetings of the societies of which he and they were members. Fred Seymore, from whom he bought groceries; Alfred Smith, who was in the hardware and farm machinery business and from whom McGrady occasionally bought articles for his home and farm; H. E. Cain, a druggist from whom he bought drugs; George Isherwood, editor of the *Tampico Tornado,* whom he visited about twice a week; Roy E. McKenzie, who was in the hardware and farm implement business, from whom he bought paint for his house in 1918 and a tractor and hardware for a crib on the farm which he was re-modeling in 1919; John Turner, a clerk in a general store, who visited him at his home and saw him regularly at the Masonic lodge, the Eastern Star and the White Shrine; F. Akerburg, manager of the

Simpson Lumber Company and from whom he bought lumber for a corn-crib in 1919; Fred W. Smith, who was a member of the Grand Army post of which McGrady was quartermaster and met him two or three times a week; A. T. Glassburn, who was in the banking business until May 17, 1918, and had banking business with him until then but went away and did not see McGrady until October, 1919; J. B. Greenman, an insurance agent, who met him every day or two; Eli A. Furry, who was working on the McGrady farm in 1918, which McGrady visited two or three times a week except while he was sick; the physician, Terry, who attended him in the sickness of 1918; Bert D. Greenman, who was in the drug business and with whom McGrady visited when he was down-town; Walter Elmendorf, from whom McGrady bought meat and who took a live stock journal which McGrady frequently consulted; Glen Steadman, a rural mail carrier, who was also an automobile salesman and engaged in the garage business and sold McGrady a Maxwell automobile in July, 1918, and visited with him frequently; Frank Yarde, who was his neighbor from March 1 to August 31, 1918, and visited with him once or twice a week; Willis L. Brown, who frequently met McGrady in the street and stopped and talked with him; John W. Johnson, who was a farmer residing just east of the McGrady farm and saw and talked with McGrady both in town and when McGrady was on his way to his farm; Ed C. Bollenback, who was in the real estate business and saw and talked with McGrady sometimes every day and sometimes every two or three days; Charles R. Aldrich, who was a boy with McGrady and saw and talked with him frequently; Harry Rice, who knew McGrady for ten years and worked on his farm in 1917 and after July 1 in 1919, and saw and talked with him there; William J. Love, a stock-buyer, with his office at the office of the Tampico Farmers' Elevator, where McGrady was a frequent visitor; J. M. Olsson, supervisor of the town of Tampico,

who clerked at sales and had seen McGrady at sales and frequently met and talked with him on the street; J. H. Hellier, an auctioneer, who saw and talked with him at sales and frequently elsewhere; Newton E. Denison, city clerk and newspaper editor, who saw and talked with him several times a week in 1918; Emmitt B. Cummings, clerk in Greenman's drug store and harness shop, where McGrady purchased harness and cigars, and who also met him at the Masonic lodge and played cards with him; Mrs. Louie VanBibber, who lived about half a block from McGrady and visited him and his family; Warren Hixon, who played cards with him every day and sometimes once or twice a week; and John E. Strauss, the barber whom Mc-Grady patronized,—all of whom had known McGrady long and well and who saw and talked with him in most cases from one to several times a week during the period involved, some of whom had done business with him, many of whom were his intimates, whom he visited upon his frequent visits to the business part of the town, both before and after the sickness of 1918, and who talked with him about the crops, the cattle and hog markets, the world war, cards, lodge, Grand Army matters and current events, and who for the most part had long association with him and frequent opportunity to observe his conduct and conversation, testified that they considered McGrady of sound mind.

Of the seventeen witnesses examined by the contestants, eight or nine state more or less definitely that in their opinion the testator was of unsound mind. Martin G. Love, who had known him since the civil war, testified that he saw McGrady in 1918 and McGrady said he had made a will recently and it wasn't just the way he wanted to make it. Love told him if it wasn't he would burn it up and make another, and McGrady said he would have to let it go as it was, and gave no reason for it. A few days after that Love met McGrady at the same place and had the same conversation. Love talked with McGrady a good

many times after that but not about the will. He does not
state either the subject or the substance of any conversation
or anything that was said. He knew that there was a dis-
like between McGrady and his daughter Pearl, and had
heard McGrady say he did not like it because Pearl mar-
ried Landwair. McGrady looked like an old man who had
been sick and his memory was very poor. Love was of
the opinion that McGrady was of unsound mind.

Lawrence McNamara, who had known McGrady for
thirty-five years, seeing him three or four times a year but
having no business dealings with him, testified that he saw
him in Tampico in September or October, 1918, and Mc-
Grady told him that he had made a will and left his grand-
daughter out; that his women folks had made him do it;
that this girl's father and Ralph McGrady had done more
for him than the rest of the family and Ralph had become
very prosperous without help from him. His physical con-
dition at that time was the poorest that McNamara had
ever seen it. He testified that he believed McGrady was
of unsound mind.

George Briedy testified that he lived in Prophetstown
and had known McGrady for ten years,—met him socially
and at lodge; that once in the fall of 1918 on the street in.
Tampico and once in 1919 at the Masonic hall in Prophets-
town he met McGrady and spoke to him and McGrady
failed to recognize him. From these incidents Briedy con-
cluded that McGrady was of unsound mind. Briedy and
McGrady lived in different towns and met only occasion-
ally,—the witness could only recall two occasions in 1918
and in 1919 and prior to that only five or six times a year.

Foster Winchell, who was in the real estate business
in Tampico, knew McGrady and talked with him a good
many times after January 1, 1918, and had talks with him
twice after his sickness about the crops and a number of
other things. He could see that McGrady was not just the
same as he used to be. The change he noticed in him was

that he did not speak as freely and he walked with a cane, was slow in speech and did not seem to particularly care whether he talked or not. He told Winchell that he had had a stroke and had been pretty sick. In answer to the question whether he was of sound or unsound mind Winchell said, "If I understand those things right, he had melancholia,—a melancholy disposition; I would rather think it was unsound mind,—not safe to do business." On cross-examination he said that he could not see but what McGrady's talk was fairly good. The only way he could say about it was his slowness of speech,—a rather indefinite way; nothing like he used to be as well as he knew him; that nothing he said in these conversations would lead him to believe that McGrady was of unsound mind more than he could notice it in his speech.

Louis B. Winchell met McGrady and talked with him after his illness in 1918, and the only difference that he observed in his manner of talking or speech was that he was weak and didn't talk any more than he had to. He said he would act more like a ten-year-old child or something of that kind. For a man of his age and the experience he had had he would call him unsound. He did not state anything said by McGrady or the subject or substance of any conversation or any act which he regarded as like a ten-year-old child.

Robert Collins, a salesman, observed a change in McGrady after his sickness. He looked run down and didn't seem to take the interest in talking that he did before,—wasn't as talkative or as jovial as he used to be. He couldn't carry on a conversation as he used to and did not talk connectedly as he formerly did. On the basis of these statements he had an opinion that McGrady was of unsound mind, though he did not undertake to state any of his conversations with McGrady.

Freeman Foy, who lived about three blocks from McGrady's home but did not visit him there, met him on the

street and in the club room and played cards with him occasionally, and noticed after his sickness that McGrady was quite feeble and didn't seem to carry on a conversation as he did in years before. He did not notice anything more about his manner of speaking or talking, and did not know as he "ever saw that he was off, as far as that is concerned, only he wouldn't carry on a conversation like he used to; he would just about merely answer your questions and that was about all." He stated that he had an opinion as to his soundness of mind on July 17, 1918, and the opinion he expressed was that his mind wasn't what it was before his sickness.

Heman Tabor was a brother-in-law of McGrady's son Ralph. He testified that after his sickness McGrady seemed to be in a weakened condition and kind of dazed and didn't seem to be as talkative as usual. At the time of the homecoming at Prophetstown in the fall of 1919 he talked with McGrady, who said he had made a will and it didn't suit him,—that Biddy and Florence made it. In haying time in 1919 McGrady was at Tabor's house and said that he had 320 acres of land. He had only 240 acres, and his conversation was flighty. He didn't seem to carry on a conversation as he used to. Tabor had a talk with McGrady before he made his will about family affairs and they got to talking about Pearl. McGrady seemed to be dissatisfied with her marriage, but he said, "I will not leave her in the cold; I will provide for her for all that."

Carrie Tabor, Heman Tabor's wife, heard the conversation on her front porch between her husband and McGrady and asked how much land he had, and he said that he had 320 acres. She said he didn't visit like he used to and didn't talk much. She expressed no opinion in regard to his soundness of mind, though she said, "I thought he acted awful queer."

Orten McGrady was the testator's youngest brother and saw him every year or two. He testified that they

talked many times about the testator's family, and McGrady thought the world of the boys and girls both. Pearl seemed to be his pet when she was home to see them. He stayed all night at testator's home during his sickness in the summer of 1918 and lay down on the dining room couch, right beside his bed-room. No one else was in the testator's room during the night. Orten got him water a couple of times. The testator dozed off once and Orten got up and went into the room, and he looked up and asked who he was. Orten looked at him and said, "You don't know me?" and he said, "Yes, I do now, since you spoke." Orten saw the testator once three or four weeks after that, when he was sitting on the front porch, about half asleep. As Orten walked up the sidewalk testator didn't know him when he first went up. He saw him again at the soldiers' re-union at Sterling, in July, 1919. As they walked up the street together the testator saw Pearl across the street and went across and talked with her there for a half or three-quarters of an hour. He shook hands with her and bade her good-by and then he and Orten went to dinner together. Orten asked him how he was getting along, and he said not very well. He said he made his will but it didn't suit him. He said he didn't make it as he wanted to,—his wife wouldn't let him.

Roy Covall, who was called by the contestants, had known McGrady about thirty years but had not seen him often since he moved, in 1915, and did not remember seeing him in 1918 and 1919, except at the old settlers' picnic, in August, 1919, when he had a talk with him and McGrady said that he was in poor health; that he had a stroke and did not remember things as he used to. Covall noticed that he was hesitating in his talk, didn't care to do much talking and his conversation was disconnected. Covall expressed no opinion as to his soundness of mind.

Bridget E. Maxfield was a neighbor, who visited McGrady in his home often. After his sickness in 1918 she noticed a change in him; he did not regain his strength

or take an interest in things that he did before; he was forgetful and absent-minded, and sometimes he would not visit very much and would not have much to say. She testified that she really never formed an opinion as to whether he was of sound or unsound mind on July 17, 1918, and that in her judgment she didn't consider a man as sick as he was, capable of making a will, and she didn't know as she could say that he was sound or unsound.

Will Furry lived a block north of McGrady and noticed a change in him after his sickness. He used to be a great man to visit, was well posted and a great reader. After his sickness he had little to say. He would start a conversation and then drop it unfinished. He was also failing physically. As to his soundness of mind, Furry said he was childish and his mind wasn't as clear as it was before.

Dr. F. W. Eskey was called in consultation by Dr. Terry in McGrady's sickness in 1918 and examined the patient. He testified at that particular time McGrady was very weak, both physically and mentally.

This was all the testimony in favor of the contestants. Considered alone it is scarcely sufficient to justify the submission of the issue to the jury. The opinions of the witnesses as to the testator's mental condition are not shown by their testimony to be founded upon any sufficient basis. No act or word of the testator has been shown indicating that he was lacking in mental power. The opinions rested on the testator's weakened physical condition; on his disinclination to conversation; on his statements that he had made his will but was not satisfied with it; that his wife and daughter made his will; the conclusion that he was childish, without any fact testified to showing that he was childish; his failure to recognize persons with whom he had been acquainted, and a mis-statement of the quantity of land he owned. The opinions of witnesses based on such slight foundations, if they are admissible in evidence at all, are entitled to very little weight.

A great deal of stress is laid upon the relation of the testator to his children and grandchild, the apparent injustice of the will and the unreasonableness of its provisions in view of those relations. This is legitimate argument with reference to the question of unsoundness of mind but was no reason for setting aside the will unless on the whole evidence the unsoundness of mind was shown. It is proper for the jury, in forming an opinion as to the condition of the testator's mind, to take into consideration the injustice, inequality or unreasonableness of the provisions of a will, taking into view the state of the testator's property and family, the situation of his relatives and the claims of particular individuals on his bounty. (*McCommon* v. *McCommon,* 151 Ill. 428; *Piper* v. *Andricks,* 209 id. 564; *Dowie* v. *Sutton,* 227 id. 183.) A will cannot, however, be impeached merely because of the injustice or impropriety of its provisions. A testator may from mere caprice or causeless dislike make an unequal division of his property among his heirs or give it entirely to strangers. The unreasonableness or injustice of his act may be considered as a circumstance on the question of sanity but it is not controlling, and if it is shown by other evidence that the testator is sane his will must be sustained. (*Kimball* v. *Cuddy,* 117 Ill. 213.) Where a testator has disposed of his property unequally among those standing in the same relation to him and has made apparently an unfair division, jurors are naturally inclined to find a reason for declaring the will invalid. There is no warrant in the law for doing so unless the testator was of unsound mind or subject to some improper influence. The law does not require a testator to be just, fair, reasonable, affectionate, kind or humane. It requires only that he shall be of sound mind, and it permits him to make any lawful disposition of his property.

This will left the remainder in 60 acres of the farm undisposed of. Some provision was made for each of the

testator's heirs, but the provision was very unequal. Mrs. Sollars got very much the larger share, and her son, who was not an heir, was also a devisee. The legacy to the daughter Pearl Landwair was much less than her portion as an heir would have been, and so was the legacy to the grand-daughter. Bert McGrady also received less than his share as an heir would have been, and the value of his devise was diminished by the amount of the legacy to the grandchild. It is argued that Pearl was her father's favorite,—his "pet," as one of the witnesses testified,—but several testified that she was the only one as to whom there was any dislike and that her father was opposed to her marriage to Landwair. The cause of these inequalities is not explained, but the testator was under no obligation to explain them. If he was of sound mind the validity of his will is not affected by the disposition he makes of his property, provided such distribution contravenes no rule of law.

Some evidence was introduced of statements of Nelson and Mrs. Maxfield supposed to be contradictory of their opinions in regard to the testator's sanity, but we do not regard them as weakening their testimony. Not only did the appellants produce the greater number of witnesses, but their testimony was more satisfactory and convincing than that of the witnesses for appellees and their opinions were based upon a more satisfactory foundation. We recognize the rule that this court will not set aside a verdict which is not manifestly against the weight of the evidence, but giving the verdict of the jury and the decree of the chancellor, who heard and saw all the witnesses, the weight to which they are entitled, we still regard the verdict as manifestly against the greater preponderance of the evidence.

The decree will therefore be reversed and the cause will be remanded to the circuit court of Whiteside county.

*Reversed and remanded.*