(No. 15806.—Decree affirmed.)
BIRDIE A. MARSHALL, *et al.* Appellants, *vs.* ANNA MOON
*et al.* Appellees.

*Opinion filed April 14, 1924.*

1. DEEDS—*temporary ungovernable passion and loss of temper will not invalidate deed.* Proof that the grantor was subject to occasional spells of ungovernable passion, loss of temper and harshness to his family is not, alone, sufficient evidence of mental incapacity to invalidate a deed, which conveys his property at his death to a person who was not related to him.

2. SAME—*disposition of property does not determine validity of deed.* In a suit to set aside a deed conveying the grantor's property at his death to a person with whom he lived and who was not related to him, the court cannot base its decision upon its view of the justice or injustice in the distribution of the property; and the fact that the deed deprives the grantor's children of a large part of their inheritance is merely an element to be taken into consideration in connection with evidence on the issues of mental incapacity and undue influence.

3. SAME—*what undue influence will invalidate a deed.* Undue influence which will invalidate a deed must be directed toward procuring the deed in favor of a certain party and be such as to destroy the freedom of the grantor's will and purpose, thereby making the instrument more the result of the will and intent of another than that of the grantor himself.

4. SAME—*when presumption of undue influence does not arise from the relationship of parties—burden of proof.* In a suit to set aside a deed conveying the grantor's property at his death to a party with whom he lived and who was not related to him, where there is no proof that the grantee exercised or attempted to exercise any influence whatever over the grantor to induce him to execute the deed, there is no presumption arising from the relationship of the parties, as being fiduciary or confidential, that casts on the grantee the burden of proving the fairness of the transaction.

5. SAME—*all evidence must be considered in determining validity of deed on charges of incapacity and undue influence.* In a suit to set aside a deed on the grounds of mental incapacity and undue influence arising from the relationship of the parties, all the competent evidence in the record must be considered.

6. SAME—*when deed is sufficiently delivered in escrow to grantor's agent.* There is no delivery of a deed where the grantor gives

it to his agent with no intention of relinquishing dominion over it until a later time fixed for its delivery by the agent, but where the grantor gives the deed to the attorney who drew it and who fully explains to the grantor the principles governing a delivery in escrow, and the grantor, upon handing the deed to the attorney, directs him to deliver it to the grantee at the grantor's death, there is a complete delivery in escrow.

7. SAME—*intention is controlling fact in determining delivery.* The grantor's motive is the controlling fact in determining whether there has been an effective delivery of a deed, and such intention is to be gathered from all the circumstances attending the transaction.

APPEAL from the Circuit Court of Peoria county; the Hon. CHARLES V. MILES, Judge, presiding.

TICHENOR, TODD, WILSON & BARNETT, for appellants.

S. F. McGRATH, and J. E. DAILY, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

A bill was filed by appellants February 11, 1921, to set aside a quit-claim deed purporting to have been executed by Albert A. M. Marshall on November 9, 1910, and delivered by him in escrow, conveying to appellee Anna Moon 140 acres of land in Peoria county, on the ground of mental incapacity of the grantor, and that the fiduciary relationship of the grantee raised a presumption of undue influence. There is also a question as to whether the deed was legally delivered. The matters in question were referred to a master in chancery, who heard and reported the evidence, discussed it at length and in detail, and found in favor of appellees. The chancellor overruled the objections and exceptions to the master's report and the same was confirmed, and the bill of complaint was dismissed for want of equity at appellants' costs. From that decree this appeal has been taken.

Albert A. M. Marshall in his lifetime was a farmer for many years in Peoria county and at the time of making the

deed in question owned at least 180 acres of land, worth, according to the evidence and statements in the briefs and arguments, about $125 an acre. Marshall's first wife, by whom he had one son, Reuben, had been dead many years. By his second wife, who died in 1902, he had four daughters, Birdie A. Marshall, Cora M. Marshall, Jane M. McGarrah and Stella M. Cowperthwaite, and three sons, William A., Harry E. and Ernest W. Marshall. All of said eight children, appellants here, survived at the time of their father's death, September 20, 1920. One daughter, Nellie, died some years previous.

A large number of witnesses were called to testify, who gave opinions as to the mental capacity of Marshall, the grantor in the deed in question. There is no testimony of any character as to acts of undue influence, and as we understand the arguments of counsel for appellants, they do not seriously contend that any acts of undue influence were shown in the record, but argue at length as to the mental capacity of the grantor and as to the fiduciary relations between him and the grantee. We will not attempt to set out all the evidence bearing on these questions but simply the material parts.

Marshall, at the time he made the deed in question, was seventy-two years old. For many years prior to that time he had resided with his family on the premises described in the deed, which, with a 40-acre tract adjoining, to which reference will hereafter be made, constituted his home farm, which he had worked with his boys and girls until they respectively came of age or left home to engage in teaching or in other occupations of their own. After his second wife's death, in 1902, his daughter Cora kept house for him for a time, but he soon decided to break up housekeeping, and he leased the farm to his son William in 1903. After that he lived for a time in Nebraska, where his son Reuben and other relatives, and friends whom he had previously known, resided. At that time it appears that all the boys

were married and that two of the girls were teaching and one was attending school. A part of the time he was in Nebraska he lived with his son Reuben. Later he returned to Illinois and lived with his son Harry at Maquon, in Knox county, and some of the time with his son William on the home farm. Some time in 1907 he became dissatisfied with the management of the farm by William and terminated the lease and rented the farm to appellee Horace Moon and his brother, Herbert Moon. Herbert soon relinquished his interest, and Horace and his wife continued in possession of the premises until Marshall's death and are now in possession of the 140 acres mentioned in the deed. The other 40 acres heretofore mentioned were conveyed by Marshall in 1917 to three of his daughters, Birdie, Cora and Stella, but the deed was not delivered until his death. No real estate apparently was deeded to any of the boys or to the daughter Jane. Some time in 1907 or 1908 Marshall made a second extended visit to Nebraska. He went to live with the Moons in the early part of 1909 and resided with them continuously thereafter until his death.

In his earlier manhood Marshall apparently possessed good health and was physically strong. As he grew older his eyesight became impaired and he became more feeble physically just previous to his death. His throat became affected, one physician stating that he had paralysis of the soft palate. It appears that he had drawn wills at different times, and the last one was contested and the probate thereof was set aside on the ground of mental incapacity. He was a member of the Baptist church, but in later years, at least, was irregular in attendance. There were many witnesses who testified that they never saw anything out of the ordinary in any particular acts of Marshall or in his conversation or appearance, while others had seen him give way to anger. He insisted upon obedience in his family, even after his children were grown, and quoted the Bible as his authority for such parental right. The occasions

when he showed a lack of self-control and the manner and severity of his discipline constitute not a little of the basis for the charge of mental incapacity brought out in the testimony. Some of the things relied upon by counsel to show insane delusions or that the grantor was not capable of disposing of his property were to the effect that he frequently became angry when he did not have his own way, and when displeased with different members of his family would say that he would disinherit them, or that he intended to disinherit them, because of their acts. He had sent different members of his family from his home at different times for some act of disobedience or opposition to his wishes. He seemed to have an idea that if he told one of his children to do anything it was the duty of the child to do it without questioning the right or wrong of the request. He took his son Harry out of school because he once played "hookey." The son Ernest, in getting a binder ready for use in the harvest field, put certain slats in the machinery and it would not work right, and in the heat of Marshall's passion because of this mistake, when he could not find the boy afterward, he referred to him as being no good and lazy and that it would have been better if he had killed him when he was a baby. Once when his son Harry remonstrated with Marshall and would not permit him to whip his (Harry's) child, the father became angry with the son and said he did not suppose a child of his would ever tell him that he could or could not do certain things, and then stated he would disinherit the son for it. On another occasion he desired to take his youngest daughter, Stella, out of school so that she could read to him and keep him from becoming lonely, and when the older daughters interested themselves in the youngest daughter's behalf and took her back to school, Marshall said he would disinherit Stella and was angry with the others for their interference. The testimony also shows that he whipped his son Harry, when he was small, so severely that blood came from Harry's body and that stripes

311—39

were left as the result of this punishment. The evidence tends to show that it was the belief of Marshall that he was entitled to his children's wages until they were of age. None of them received anything for their work at home during their minority, and those who worked for wages before they were of age turned the same over to their father. The daughters Birdie and Cora, it appears, began teaching when they were sixteen or seventeen years of age. One witness testified that Marshall said, when opposition was shown by his daughters to his marrying a former housekeeper, he would disinherit them for their opposition, and in referring to the housekeeper he stated that her soul was doomed unless she asked his forgiveness. It is also testified by another witness that he proposed taking her to the Jamestown exposition and paying her expenses. He had expressed a desire on more than one occasion to marry a third time or have some woman or girl keep house for him. He had given a hired girl working in the home of his son Harry $30 and had shown some interest in her and wished to help her. Harry about this time visited Nebraska with a view to learning how his father was spending money, and this was the occasion of the father writing a letter which has been certified to this court for inspection. It is dated in 1908, two years before the deed in question was executed, and is to the effect that he knew the purpose of Harry's visit to Nebraska and that it was for the purpose of dishonoring the father, mentioning that Harry was trying to turn his friends against him. Marshall further stated that he had helped Harry every year since he was married, and also referred to a note he had signed with the son, and demanded payment of $300 or he would ruin his son's credit with the bank. The letter is in very good handwriting for an aged person and is connected in composition. The signature to the deed, two years later, is in a more feeble handwriting. It appears that when he stayed at the home of friends in Nebraska for more or less extended periods he

did so without any suggestion of paying board, but sometimes made repairs or suggested improvements of the property, to be taken care of by himself for prospective services rendered him.  One of his housekeepers testified that when Marshall was younger he was an affectionate and lovable man except that he was always stern and severe with his children, but that in later years especially he complained of the method of doing the work by the boys.  His talks of disinheriting his children were of frequent occurrence, and he often spoke disparagingly of his children to strangers and sometimes used profane language.  One witness stated that sometimes his talk was disconnected, and another witness stated that sometimes he appeared to wish to say something that he could not say, and that on more than one occasion when he spoke of making his will in a certain way and the person to whom he was talking said he thought Marshall intended to distribute his property in a manner he had previously indicated to the witness, the old gentleman would say "Oh no," as if he never remembered the previous discussion to that effect.  His daughter Birdie testified her father told her on one occasion that she was no child of his, simply because she had suggested that he was mistaken in saying he had seen or read Uncle Tom's Cabin before he came west, because, as the daughter remarked, the book was not written until a later time.

There were many witnesses who testified to having had conversations with Marshall the year the deed was dated, or about that time, before and after, and that he was able to transact business and that his conversation always appeared rational.  Among these witnesses were physicians who attended him, lawyers who assisted him in legal matters, farmers and neighbors who knew him personally and visited with him, the assessor, carpenter, insurance agent, and many other witnesses who knew him for many years.  Many different instances of transacting business or carrying on of friendly conversations were mentioned by those

who testified, in all of which Marshall talked coherently and was self-possessed, and some of the witnesses went so far as to say he was shrewd, well read, a good conversationalist and had a good memory. While one or two of appellees' witnesses thought he had grown somewhat childish and others noticed his increasing impairment of eyesight and some loss of physical vigor as the years passed, there was very little evidence of any looseness in his method of doing business. He had at one time loaned a man named Bruce $200 without taking security, which appellants somewhat rely upon. It appears without question he did turn over the work of writing checks to his tenants, the appellees, that his eyesight became very poor, and that he turned over the writing of checks to his son William when he was on the farm before he had leased the farm to appellees. After he had leased the farm to appellees he was blind in one eye for a number of years and went blind in the other eye before his death and required a good deal of care. The bank checks and other papers were turned over to the administrator upon his death and many statements and checks were introduced in evidence. There was no showing of any improper handling of any of these transactions on the part of anyone. A Baptist missionary, who had been sent to Brimfield,—the town nearest Marshall's farm,—to help the church there, called upon Marshall at various times during the years he was there, and testified that Marshall always contributed to the church and appeared to the witness to be able to transact ordinary business.

While the evidence tends to show that Marshall was unreasonable and extreme with and abusive to his children at times, the evidence also shows, and the master found, that he still, after deeding this property, retained affection and exercised consideration for his children, which repeatedly manifested itself in different ways after the exciting cause which had created his anger had subsided, and it clearly appears that he deeded to three of his daughters 40 acres of

land,—a part of the home farm,—long after he had quar-
reled with and threatened to disinherit them and after he
had requested Stella to come back home and live with him.
From all the testimony in the record we think it must be
held that Marshall was a man of quick and ungovernable
temper and that at times when his will was opposed he did
and said unreasonable things in the heat of passion. His
strictness of discipline and stern and harsh methods doubt-
less do not accord with present day methods of rearing chil-
dren. While the occasions of loss of temper and acts of
harshness were perhaps more frequent as he grew older,
we cannot say they constitute sufficient evidence of mental
incapacity to invalidate the deed in question. The fact that
he at times may have been subject to ungovernable pas-
sion is no proof of insanity within the meaning of the law.
(32 Corpus Juris, 593, note; *Garner* v. *State*, 112 Miss.
317; *Walker* v. *Struthers*, 273 Ill. 387.) In this last case
we said, among other things, (p. 398,) that it was shown
that the testator, whose mental soundness was questioned,
was a man of high temper and frequently became much en-
raged, but these characteristics, with others, were not con-
sidered sufficient to set aside the will because of mental in-
capacity. This court is not permitted to base its decision
in a case of this kind upon its view of the justice or in-
justice in the distribution of property. (*McGrady* v. *Mc-
Grady*, 298 Ill. 129.) Many of the transactions and acts
referred to and relied upon by appellants were more or less
remote and in different years, both before and after the
deed in question was executed. There was very little tes-
timony of a specific character as to the grantor's forget-
fulness or actual mental weakness, or of any disconnected
method of talking, other than that he was a great talker and
talked upon the same subject a great deal, and sometimes,
perhaps, his talk was in a haphazard way. There was no
showing of a close supervision by appellees over the acts
of Marshall at any time, either when the children came to

see him or when strangers were present. It was testified that Mrs. Moon was always in the house and that none of the doors were closed. Sometimes she would be in the kitchen and sometimes in another room, but there was nothing to prevent private interviews if anyone had desired. The method of handling the proceeds of the harvests and products of the farm is in no way questioned, and from all that appears the business was handled in much the same way during the tenancy of appellees as under the management of the son William in previous years.

It is argued by counsel for appellants that the farm given to appellees was of much greater value than would be a proper remuneration for taking care of the grantor from 1909 to 1920,—the date of his death,—especially in view of the fact that the farm, under the leasehold, yielded an additional income to the appellees each year of their tenancy. The evidence shows, without much contradiction, that Marshall clearly knew, at the time he executed the deed, as to his property and as to the conditions under which he was executing the deed. The deed was drawn by Walter A. Clinch, formerly probate judge of Peoria county, who testified at length in regard to the execution of the deed. Clinch at the time he executed the deed was engaged in the banking business at Elmwood, Peoria county, and had not been practicing law actively for some time. It appears from the record that the father of Clinch, and James Rayfield, the father of Anna Moon, were cousins, and that Clinch had known Anna Moon ever since she was a small child, and had known Horace Moon from a short time before he married Anna; that Clinch, before executing this deed, had not been the regular attorney of Marshall but that his legal business had been taken care of by Charles W. Hamilton, an attorney located at Brimfield, who had usually acted for Marshall when he required legal advice; that Rayfield sent word to Clinch at Elmwood that Marshall wanted Clinch to come to the home of Marshall for

the purpose of drawing some legal instrument, the exact character of which Clinch was not advised by Rayfield; that pursuant to said request Clinch on November 9, 1910, (the date of the execution of the deed,) went from Elmwood to the residence of Marshall with certain blank deeds and papers, prepared to draw whatever instrument might be required; that he went first to Brimfield and was driven out to the residence of Marshall, which was then with the Moons on the farm conveyed by the deed in question; that they went into the front room and conversed for a time about general matters; that thereupon Marshall explained to Clinch what he desired to have done and his reasons therefor, which explanation and the advice of Clinch are set forth at length in the record. Among other things Marshall said to Clinch that he had previously endeavored to have one of his daughters come and make a home for him, so that he and the daughter might have a home on the farm where he lived for a great many years, but that none of his daughters would agree to come and live with him and had declined his offer of a home; that his home with Mrs. Moon and her husband had been very pleasant and agreeable in every respect and that he expected to make his home with them the balance of his lifetime, and that to remunerate them it was his purpose to make them a deed to the tract of 140 acres; that Clinch explained to him that he might provide for Mrs. Moon by way of will or by way of a deed; that if the plan by deed should be preferred it would be necessary for him to execute the deed and leave it in the hands of someone or some bank in escrow, to be held by such person or bank during his lifetime, to be delivered after his death to the grantee; that if this were done he would not have any legal right, during his lifetime, to recall the deed, but would continue to have the right to receive the rents and income from the farm until his death; that Marshall then directed Clinch to prepare, and he did prepare, the deed in question; that Marshall furnished him

with the description of the premises to be conveyed and executed the deed after it was prepared; that after Marshall had read the deed and executed the same he handed it to Clinch and told him to keep it until the day of his death and then deliver it to Mrs. Moon; that he had so held the deed until after Marshall's death, and that Marshall retained no dominion or control over it during the time Clinch held the deed; that after the deed had been executed and delivered to him, he and Marshall went together into the dining room and found Mrs. Moon and Marshall told her what he had done; that he had made the deed to her and had given it to Clinch, to be held until Marshall's death; that the deed was made to compensate her for the care which she would give him during his lifetime; that Mrs. Moon said to Marshall that perhaps he should not have done that,—that it might make a lot of trouble, or words to that effect; that she further said, upon Marshall insisting upon her taking the deed, with reference to Marshall's statement that he intended to make his home with her for the rest of his life, that she would do the best she could for him and try to make his home pleasant as long as she was physically able to do so. Clinch further testified that he then took the deed with him to Elmwood, placed it in an envelope, sealed the envelope and noted on the back thereof the contents of the same and the disposition that was to be made of the deed, and placed it in the bank vault of the Citizen's Bank at Elmwood; that it remained in the vault until Marshall's death, whereupon Clinch went to the bank, got the deed, sent for Mrs. Moon and handed the deed to her, and that she then gave it back to him and asked him to have it recorded, which he did. He further testified that he talked for about an hour and a half with Marshall about the details of the deed before it was executed and observed his physical condition; that while he was not a strong man, he seemed to get about the house and yard without serious difficulty; that there was no impediment in his

speech at that time; that he could see all right; that the whole consultation with Marshall about the matter was had with Marshall alone, and the instructions given by him were out of the presence of anybody whomsoever; that he had no conversation with Mrs. Moon about the matter prior to the execution of the deed, and had no idea what Marshall wanted him to do until he went there to visit him and talked over the matter; that in his opinion Marshall was of perfectly sound mind at the time they talked and was of sound mind and memory at the time he executed the deed and in every way capable of transacting the business in question; that he was satisfied that Marshall understood fully the legal phases of the question with reference to the transaction and of Clinch holding the deed in escrow; that Marshall would have no control or dominion over it and at his death it was to be delivered to Mrs. Moon; that his employment for the execution of the deed was made by Marshall, who paid him for the work of drafting the deed.

The master found with reference to the execution of the deed, that at the time of its execution the only relation existing between Marshall and the grantee was that of landlord and tenant or boarder and landlady, and that such relationship did not create a presumption of special confidence or influence; that Marshall's condition previous to the execution of the deed, and before he was living with the Moons, was substantially the same as it was after he went to live with them and after the execution of the deed; that thereafter he became gradually weaker and became bedfast, requiring more and more attention on the part of the Moons in caring for him. He was greatly dependent upon them for his comfort and welfare, not only for his personal care but for attention to his business, but his physical and mental condition at the time of the execution of the deed was not dissimilar to what it had been at the time he was living with his son William on the farm, during the latter's tenancy. We agree with the conclusions of the master in

these regards, and the evidence, in our judgment, fully supports his conclusions.

It is strenuously argued by counsel for appellants that at the time of the execution of the deed there was a relation of trust and confidence existing between Marshall and the grantee, which in itself should, under the circumstances of the execution of the deed, cause it to be set aside. The record shows that Mrs. Moon and her husband drew checks for Marshall and performed other services for him, and there is also evidence that Marshall had confidence in Mrs. Moon and her husband, but we think the evidence very strongly preponderates in favor of appellees that there was no improper influence exercised by them. We find no evidence in the record that justifies a conclusion that they used any improper influence with reference to the execution of the deed or in other matters with reference to the care of Marshall. The facts shown and relied upon by counsel for appellants from which an inference could be drawn of improper relationship are insufficient to support such a conclusion. As was said under a somewhat kindred state of facts in *Boardman* v. *Lorentzen,* 52 L. R. A. (N. S.) 487: "There must be shown a subject unquestionably susceptible to undue influence, either as the result of old age, mental weakness or both, also some clear evidence of opportunity and a disposition on the part of the beneficiary to exercise such influence, in order to raise the presumption of such exercise, and call upon the defendant to so far weaken it, at least, as to destroy efficiency to establish the ultimate fact." The influence must be directed toward procuring the will or deed in favor of certain parties, and be such as to destroy the freedom of the testator's or grantor's will and purpose, thereby making the instrument more the result of the will and intent of another or others than that of the testator or grantor himself. (*Gregory* v. *Richey,* 307 Ill. 219.) There is no presumption of law arising from the relationship of these parties which will cast on appellees the burden,

in the first instance, of proving that the execution of this deed was not procured by any undue influence on their part over the grantor. Appellants charge the fact to be that the deed was thus procured. The burden of proof upon that question is on them throughout and is not shifted to appellees by proof merely of the relationship between the parties. There is no proof in this record that appellees, or either of them, exercised or attempted to exercise any influence whatever over Marshall to induce him to execute the deed. If there were such influence, there might be drawn an inference of fact of more or less strength, depending upon the quantity and quality of the character of the evidence upon which it rested. (*Sears* v. *Vaughan,* 230 Ill. 572.) We find no evidence in the record, *prima facie* or otherwise, that tends to indicate that appellees attempted to exercise such influence at or before the time of the execution of the deed, and therefore we think, under the authorities, that no inference can be drawn from the record that undue influence was exercised by appellees through their fiduciary or confidential relation, and the deed should not be set aside because of the showing in the record as to such relation.

We agree fully with the reasoning of this court in *Berry* v. *Egan,* 291 Ill. 377. The facts presented in every case of this kind materially control the question of undue influence, and the facts shown on the record in the *Berry case* were very different from the facts shown on this record as to the care and control of the person executing the instrument at the time of its execution. In addition to the authorities already cited on the question of undue influence, see, also, the reasoning of this court in *Pond* v. *Hollett,* 310 Ill. 31, *Heiligenstein* v. *Schlotterbeck,* 300 id. 206, and *Ludewick* v. *Ludewick,* 279 id. 26. The mere facts that the grantor was advanced in years and that the deed resulted in an unequal division to or deprived some of his children of property which they would have inherited had there been

no will or previous disposition of the property are not sufficient to defeat the deed. These facts, at most, are only an element in the case, which could be taken into consideration in connection with all the other facts and circumstances shown in evidence bearing upon the issue in the case, and in a close case might require that the record be free from error in the introduction of testimony and in the giving and refusing of instructions. (*McGrady* v. *Mc-Grady, supra.*) As said in this last case (p. 141): "The law does not require a testator to be just, fair, reasonable, affectionate, kind or humane. It requires only that he shall be of sound mind, and it permits him to make any lawful disposition of his property."

Counsel for appellants rely very strongly upon the reasoning and conclusion of the court in *Allore* v. *Jewell,* 94 U. S. 506. All the facts in that case must be considered in order to establish whether the reasoning there should have any influence in this case. We recognize the conclusion in that case that all the evidence in the record should be considered before reaching a conclusion on this question. In this case the grantor had expressed a wish that during the remainder of his life Anna Moon should care for him properly, and she had expressed a willingness to do so. He had not been able to live in entire agreement with any of his children, and whether he was right or wrong in his attitude toward them, he had the right to provide for his future care as he saw fit. There was nothing to indicate that Clinch, who drew the deed, was acting for or on behalf of appellees, and there was no testimony as to the impropriety of his drawing the deed as the grantor requested.

It is also argued that the deed was left with Clinch in his capacity as agent of Marshall, and that therefore there was no delivery of the deed, even in escrow. Appellees contend that Clinch's agency ceased with the execution of the deed and the payment for his services, which was made

at that time, and that the delivery to him was not as agent but was the same as to a stranger. The law undoubtedly is that if the agency continues there is no delivery where there is no intention of relinquishing dominion over the deed until a later time fixed for its delivery by the agent. Clinch testified that he explained the method of delivery in escrow, and that if the deed was delivered in escrow Marshall would not have the legal right, during his lifetime, to recall the deed, and that such third party would be authorized to deliver the deed at his death, and that after this explanation had been made Marshall handed the deed to the witness, to be delivered to Mrs. Moon at the date of his death. This, in our judgment, was a sufficient delivery in escrow. (*Whipple* v. *Carrico,* 305 Ill. 164; *Fitzgerald* v. *Allen,* 240 id. 80.) The grantor's motive is the controlling fact, and that intention is to be gathered from all the circumstances attending the transaction. (1 Devlin on Deeds,—3d ed.—sec. 317*a*.) We think the finding of the master is amply supported by the evidence that Marshall understood what he was doing at the time he executed the deed and that it was delivered in escrow to Clinch, that Marshall lost dominion and control over the deed after it was so executed and delivered, and that his intention was amply shown that the deed should be delivered in escrow, and therefore the deed was properly delivered to Clinch and properly turned over by him afterwards to Mrs. Moon. The master made such a finding, and this finding is sustained and supported by the decree of the circuit court.

We find no reason to disturb the findings of the master and the decree of the circuit court on any questions raised, and the decree will therefore be affirmed.

*Decree affirmed.*