CLAUDE J. HARRINGTON, Appellant, *vs.* PEARL E. TRAVIS, Appellee.

*Opinion filed October 22, 1932.*

HIRAM A. BROOKS, GEORGE C. DIXON, MARK C. KEL-
LER, and EDWARD A. JONES, for appellant.

J. C. SEYSTER, W. P. FEARER, and ANNA M. MOORE, for
appellee.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Appellant, Claude J. Harrington, filed a bill in the cir-
cuit court of Lee county praying for partition of 80 acres
of land in that county owned by him and appellee, Pearl
E. Travis, as tenants in common. The bill also prayed
that a deed to appellee from Chester Eugene Harrington,
the father of appellant and appellee, conveying 160 acres
of land in that county, be set aside and that land also par-
titioned. An answer was filed by appellee, to which appel-
lant filed a replication. The cause was referred to a mas-
ter in chancery, who found that the deed was valid and
that appellee was the owner of the 160-acre tract and that
appellant had no interest therein. Objections of appellant
to the master's report were overruled by the master and
appellant's exceptions to the report were overruled by the
chancellor. A decree was entered which ordered partition

of the 80 acres of land owned by the parties as tenants in common but denied the prayer of the bill that the deed to the 160-acre tract be set aside and that partition be made between the parties. Harrington prosecutes this appeal.

The only contention of appellant is that the court erred in not setting aside the deed to the 160-acre tract and granting partition of it. The deed is a quit-claim deed dated June 2, 1924, and acknowledged by Chester Eugene Harrington on July 5, 1924. It was filed for record and recorded in the recorder's office of Lee county on July 7, 1924. It purports to convey to appellee the 160 acres of land subject to a life estate reserved in the grantor, in consideration of "natural love and affection and one dollar." The grantor was killed May 18, 1929, by an explosion of dynamite. His age at the time of his death is not shown by the record, but from facts appearing in the record we conclude that he must have been then more than sixty years old. During the last fourteen or fifteen years of his life it appears that he lived part of the time on his farm and part of the time in the city of Dixon. In 1919 his wife, Emma M. Harrington, obtained a decree for separate maintenance against him by which he was ordered to pay her the sum of $75 a month. In the decree the court found that he had been guilty of habitual drunkenness for two years previous to the filing of the suit and that he had been guilty of extreme and repeated cruelty to his wife. Some time after that decree was rendered he and his wife were apparently reconciled and lived together for a while. In the briefs filed in this court counsel say that his wife obtained a divorce from him and refer to the decree rendered in 1919 as a decree for divorce. The record shows he acted as administrator of the estate of his wife and retained as heir one-third of the personal property of her estate. His report as administrator shows that he paid to himself as administrator, and accounted for, $410.08 due to the deceased as "temporary alimony," his

wife having died December 7, 1926. He was a man who was addicted to the use of intoxicating liquor and during the last ten years of his life drank to excess and was often intoxicated. He was loud, boisterous and sometimes offensive and abusive in his conduct and used profane and vulgar language. Several witnesses for appellant testified that during the last eight or ten years of his life he was always under the influence of intoxicating liquor while other witnesses for appellant testified that he was a periodic drinker, and some of these witnesses testified that they saw him sober as often as they saw him drunk.

In appellant's bill of complaint it is alleged that at the time the deed was executed to the 160 acres the grantor was of unsound mind because of the excessive use of intoxicating liquor and had insane delusions concerning appellant and his mother, Emma M. Harrington, and that appellant and appellee are the only heirs of their father and mother, which latter fact was proved by the evidence.

Forty witnesses testified for appellant. One of his witnesses testified that Harrington, when drunk, frequently came to witness' house at three or four o'clock in the morning and after having awakened him stated that he just wanted to know if he (witness) was alive. Two or more of his witnesses testified that Harrington at times would go to the fire station at Dixon about three o'clock in the morning and sound the gong and awake all of the firemen. Another of his witnesses, a hotel manager, testified that when Harrington stayed at his hotel he was boisterous and disturbed other guests, and that on one occasion he had to throw him out of the hotel because of his conduct. Many witnesses for appellant testified to the fact that during the last eight or ten years of his life Harrington was very bitter towards his wife and often cursed her and called her vile names—"a whore," "a black bitch," etc. One witness testified that on the day of his wife's death he rode into the barnyard on his neighbor's farm in an in-

toxicated condition and yelled, "The old black bitch is dead! Hurrah!" Other witnesses for appellant testified that he also was bitter toward appellant and often spoke of him in very vile language. Another of those witnesses testified that at one time he said that appellant "was his mother's boy, and he didn't give a damn about either of them." Appellant introduced in evidence a letter written by Harrington on March 21, 1924, to George C. Dixon, an attorney for appellant in this case, in which he called Dixon a cur, a liar, and other vile names, and challenged him to come to the writer's farm to engage in a fight. The letter contains a great deal of very vulgar language and refers to Mrs. Harrington in, to put it mildly, the most uncomplimentary and vile terms. Dr. E. A. Sickles testified that he treated Harrington professionally at various times; that he was always addicted to the use of intoxicating liquor, was a periodic drinker, and in the later years of his life drank excessively; that witness threw him out of his office one time when he was drunk because of his boisterous and offensive conduct; that witness visited him at the city jail in Dixon when he had been put into that jail because of boisterous conduct on the street; that he was a man of violent temper and strong likes and dislikes; that in general the excessive use of alcohol has the effect of blunting the mind and dulling the perception, but that witness could not say that it had that effect on Harrington, because witness did not see him often enough in the last years of his life to express an opinion upon that subject. Only three witnesses for appellant testified to ever having heard Harrington talk about appellee. They stated that he was friendly toward her and spoke well of her. One of them stated that he said that he had a daughter that he thought "a lot of."

Twenty-seven witnesses for appellant testified concerning the mental condition of Harrington during the last ten years of his life. Ten of them stated that in their opinion

he was not of sound mind. One of the ten testified that he played cards with him and that Harrington played cards understandingly. Another of the ten, a farmer, testified that he sold things to Harrington and Harrington bought things of him; that Harrington rented his farm and transacted the business relating thereto, and that witness never saw anything in his business transactions that would indicate he could not attend to business. Another of the ten witnesses testified that he did not see Harrington very often in the last ten years of his life and avoided him as much as possible. Two others of the twenty-seven witnesses testified Harrington was not of sound mind when drunk and that they never saw him sober. Two others testified that they did not see how a man who drank as much as Harrington could be of sound mind. Two others stated that when he was sober his mind was probably all right but that he was never sober long enough for his mind to clear. Six witnesses who stated that Harrington was a periodic drinker testified that when he was sober he was rational and of sound mind but when he was drunk he was not of sound mind. One of appellant's witnesses stated that he could not express an opinion as to Harrington's soundness of mind. Another stated that Harrington was no crazier than lots of other people; that in his opinion lots of people are half crazy and crazier than Harrington, and that he transacted business all right and knew how to look after his business interests. Two witnesses stated that when Harrington was sober he was of sound mind, and that they could not say that he was of unsound mind when drinking. Jacob Alber, a farmer and stock buyer, bought stock from Harrington and transacted business with him frequently. He testified that Harrington was sober as often as he was drunk; that when sober he was of sound mind, and that he never saw him, when he was drinking, in a condition that he was unable to protect his own interests and transact business intelligently. He also testified that Harrington told him

about having made the deed to appellee to the land in question, and that he was sober when he made the statement.

William Winebrenner, who was working on Harrington's farm at the time the deed in question was made, is the only one of appellant's witnesses who testified concerning the condition of Harrington with reference to intoxication at the time the deed was signed, at the time it was acknowledged or at the time it was filed by him for record. He testified that when Harrington left the farm on the morning the deed was made he was sober but that when he came back from town that evening he was not sober; that on that evening he told witness about having made the deed, and stated that his wife was favoring appellant and that he thought he would make it all right with appellee by making the deed to her.

Forty-nine witnesses testified for appellee. The testimony of many of them corroborates the testimony of appellant's witnesses that Harrington was a man who used intoxicating liquor and that during the last ten years of his life often became intoxicated. Most of the witnesses for appellee who testified concerning Harrington's use of intoxicating liquor stated that they never saw him so intoxicated that he was unable to transact ordinary business intelligently. The testimony of some of these witnesses also corroborates the testimony of appellant's witnesses that Harrington was bitterly unfriendly toward his wife and appellant and often called them vile names. All of the witnesses for appellee who expressed an opinion concerning the mental condition of Harrington stated that up until the time of his death he was a man who knew what property he had and who knew who his relatives were and that he transacted ordinary business capably and intelligently and was of sound mind. Practically all of them, forty-four in number, had had business transactions with him and had seen and conversed with him often and up to the time of his death. Many of them stated that he was a man of

strong mind and a shrewd business man. These witnesses
were a doctor, judges, lawyers, bankers, merchants, farmers,
stock buyers, produce dealers, lumbermen, ferrymen, a car-
penter, a veterinarian, an undertaker, firemen, farm hands
and laborers, and a washerwoman. To show the nature
of the testimony for appellee in this case we shall refer
briefly to the testimony of some of her witnesses. The fol-
lowing witnesses testified for her substantially as follows:

Grover W. Gehant, an attorney at law and notary pub-
lic of the city of Dixon: He took the acknowledgment of
Harrington to the deed in question. He did not remember
whether or not he drew the deed. He was acquainted with
Harrington and saw and talked with him frequently. In
his opinion he in 1924 was capable of transacting ordinary
business and was of sound mind.

Edwin S. Rosecrans, circuit clerk and recorder of deeds
for Lee county: When Harrington brought the deed in
question to him to be recorded, so far as witness could see,
his mental condition was all right. To the best of his rec-
ollection he was sober when he brought the deed to be re-
corded and also when he called for it after it had been
recorded.

Harry Edwards, one of the judges of the fifteenth cir-
cuit of this State: He was acquainted with Harrington
during his lifetime and represented him as an attorney be-
fore witness went on the bench. He observed him in cases
before witness as a judge of the circuit court in 1924. In
his opinion he was of sound mind and capable of trans-
acting ordinary business at that time.

William L. Leech, county judge of Lee county: He
was acquainted with Harrington during the last twenty-five
or twenty-six years of his life, had done legal business for
him and saw and talked to him frequently during the last
ten years of his life. In his opinion he was capable of
transacting ordinary business and was of sound mind.

John P. Devine, an attorney at law of Dixon, Illinois, and a member of the General Assembly of this State for many years: He knew Harrington during his lifetime for more than forty years, acted as his attorney and saw and conversed with him quite frequently. While he used intoxicating liquor and was sometimes intoxicated, he could attend to his business affairs when under the influence of liquor. He was a man who used vulgar and profane language but nevertheless was a man of strong mind and good sense. In 1924 he knew what property he possessed, knew who his relatives were and was mentally competent to transact ordinary business. Shortly after the deed in question was made he told witness about having made the deed. He stated that all of the land that he had and all of the land that his sister, Inez Ione Harrington, had had, came to them from their parents; that appellant had gotten something like 100 acres of that land by the will of his grandmother and a deed from Inez Ione Harrington, and that he had made the deed because he wanted appellee to have somewhere near an equal share of the Harrington property.

John L. Davies, cashier of the City National Bank of Dixon: He knew Harrington for many years. In the years 1923, 1924 and 1925 he was mentally capable of transacting ordinary business and was of sound mind. He never had to have assistance in transacting his business affairs with the bank, and in witness' opinion he was a man of more than ordinary intelligence.

Dr. A. F. Moore, a physician of Dixon: He was acquainted with Harrington during the last ten years of his life. He treated him occasionally and saw and talked with him often. Nearly every time he saw him he was under the influence of intoxicating liquor in some degree but never was so intoxicated that he could not transact ordinary business. In his opinion his mental condition was sound.

John G. Ralston, a manufacturer in business in Dixon and a general officer of the Reynolds Wire Company: He

knew Harrington and saw him frequently in the year 1923 and thereafter until his death. Witness and his brother-in-law became interested in farming and consulted Harrington frequently about operating their farm. They had a great deal of respect for his practical knowledge of farming and when they wanted advice about any question concerning their farm they always consulted him. They bought farm produce from him and bought farm material, equipment and seed for him. He paid cash promptly for all the things that they bought for him. He was of sound mind and very shrewd in his ideas and business thoughts. Such was his mental condition in the year of 1924. Witness saw him when he had been drinking, but never saw him under the influence of liquor to such an extent that he did not know what he was doing. He stated that Harrington felt that his son had been ungrateful to him, and that he wanted his farm to go to appellee because he felt that appellant already had more than his share of his property.

Samuel Prettyman: He was well acquainted with Harrington. He worked for him for ten years and in 1929 built for him a house on his farm. He had seen him drink but never saw him drunk. He was rough-spoken and close in his dealings. His mind was always keen and his ability to transact business was very good. He never saw him when he was not of sound mind.

Other evidence for appellee shows that Harrington's mother, the grandmother of appellant, who died in 1891, by her will devised to appellant a one-fourth interest in 80 acres of land in Lee county. At the time of his death Harrington was the owner of the other undivided three-fourths of this 80 acres of land, and it is this 80 acres of land which the court by its decree ordered to be partitioned between appellant and appellee. By her will appellant's grandmother also devised to appellant another 80 acres of land, subject to a life estate therein in Inez Ione Harring-

ton. In 1904 and in 1910 Inez made deeds to appellant of this 80-acre tract of land and six lots in the village of Grand Detour, respectively, reserving to herself a life estate in the six lots. There is testimony in the record which indicates that the value of the lots is about $2000. Inez by will bequeathed $10,000 to appellant and $10,000 to appellee. She died on April 17, 1923. In her will appellant was named as the residuary legatee and devisee. In the petition for the probate of her will it was estimated that she left personal property of the value of about $35,000. The record shows that when her estate was settled appellant received from the executrix, as residuary legatee, notes and mortgages of the value of several thousand dollars. Rebuttal testimony for appellant shows that at the time of his death Harrington had on deposit in a Dixon bank $1753.22, which had been deposited in the name of himself and appellee jointly, and that this amount of money was paid to appellee by the bank after Harrington's death.

The test of mental capacity to make a deed is that the grantor must have sufficient mind and memory to comprehend the nature and effect of his act, and if he is able to understand the nature and effect of the business in which he is engaged and is exercising his own will his deed is valid. (*Sharkey* v. *Sisson,* 310 Ill. 98; *Essary* v. *Marvel,* 274 id. 576; *Kelly* v. *Nusbaum,* 244 id. 158.) No greater mental capacity is required to make a deed of voluntary settlement reserving a life estate than is required to make a will. (*Sharkey* v. *Sisson, supra.*) Evidence that a grantor in a deed was addicted to the habitual use of intoxicating liquor is competent on an issue of mental capacity to make the deed, because of the fact that it is a matter of common knowledge that the habitual use of such liquor tends to impair the mental and bodily faculties. (*Ravenscroft* v. *Stull,* 280 Ill. 406.) Where it is not shown that the use of liquor has rendered a grantor mentally incompetent to make a deed, proof that he, about the period the deed was made,

was using liquor to excess will not be sufficient to set aside the deed, unless it appears that at the time the deed was executed he was so intoxicated as to be incapable of understanding the transaction and exercising his will. (*Roche* v. *Roche,* 286 Ill. 336.) Proof of old age, eccentricity or partial impairment of mental faculties is not sufficient to set aside a deed where it is shown that the grantor had sufficient mental capacity to comprehend the nature of the transaction and protect his own interests. (*Bordner* v. *Kelso,* 293 Ill. 175.) Proof that a grantor was subject to loss of temper and ungovernable fits of passion and was harsh in his conduct toward the members of his family is not sufficient to show want of mental capacity to make a deed. (*Marshall* v. *Moon,* 311 Ill. 605.) Unreasonable prejudice of a testator or grantor against a relative is not ground for setting aside a will or deed unless it can be explained upon no other ground than that of an insane delusion. A testator or grantor may be prejudiced against some one or more of his children, who are the natural objects of his bounty, and make unfair remarks about them without having a foundation for his conduct, but it does not necessarily follow that he is without mental capacity to make a will or deed. *Noone* v. *Olehy,* 297 Ill. 160; *Carnahan* v. *Hamilton,* 265 id. 508.

We hold that the evidence in this case does not establish that the grantor in the deed in question did not have sufficient mental capacity to execute the deed, and does not establish that at the time the deed was executed he had insane delusions concerning appellant which operated on his mind to cause the deed to be executed. In fact, we are of the opinion that the evidence, when considered as a whole, establishes by an overwhelming preponderance that the grantor was possessed of ample mental ability to make the deed at the time it was executed, and that he executed the deed because of the fact that he wanted appellee to have a fair share of the property that was originally owned

by his father and mother and not because he had insane delusions concerning appellant. Appellant introduced no proof to show that the grantor, at the time the deed was executed, was under any degree of intoxication whatever, and since the evidence did not establish want of mental capacity, the proof that the grantor, at about the time the deed was executed, was in the habit of using intoxicating liquor did not make out a case warranting the setting aside of the deed. So far as the record shows, Emma M. Harrington was an estimable woman, of good reputation and character, and Harrington was wholly unjustified in using the vile epithets that he did use in speaking of her. There is no showing that he had any good reason to not think well of appellant, but the evidence falls far short of establishing that he had insane delusions concerning appellant which operated upon his mind at the time the deed was executed. The record shows that the land conveyed to appellee by the deed in question was conveyed to Harrington by his father. It shows that by the will of his grandmother and by deeds and the will of Inez Ione Harrington appellant had gotten considerable property that had been originally owned by his grandfather and grandmother. It also shows that Harrington expressed as his reason for having made the deed to appellee that he desired her to have somewhere near the same portion as appellant of the original Harrington property. The reason given by him for having executed the deed is one that is reasonable and sensible under the facts shown by this record, and it certainly cannot be said that the conveyance was made to appellee because the grantor had insane delusions concerning appellant.

There is no allegation in appellant's bill, and absolutely no evidence in the record, of undue influence on the part of appellee to obtain the conveyance or that there was a fiduciary or confidential relationship existing between Harrington and appellee at the time the deed was executed. For this reason there is no basis for the contention made by ap-

pellant that the burden of proof was on appellee to show that the deed was not procured by undue influence. The burden of proof was upon appellant to establish that the grantor was mentally incompetent to make the deed. *Campbell* v. *Freeman,* 296 Ill. 536.

The decree of the circuit court is affirmed.

*Decree affirmed.*