(No. 16504.—Decree affirmed.)
ST. LOUIS ESTES, Appellant, vs. FANNIE CLARK et al.
Appellees.

*Opinion filed June 18, 1925.*

WILLS—*what does not constitute mental incapacity to make will.*
Eccentricity, miserliness, uncleanliness, slovenliness, neglect of person and clothing and offensive and disgusting personal habits do not indicate unsoundness of mind, and in the absence of an additional showing that the testator did not know fully what property he owned, what it was worth, and his financial condition, or that he was not fully aware of his relations to those who might be presumed to have some interest in the disposition of his estate, it must be held, in a contest case, that he had testamentary capacity.

APPEAL from the Circuit Court of Cook county; the Hon. IRA RYNER, Judge, presiding.

CHARLES S. CUTTING, and JOEL C. CARLSON, for appellant.

GEORGE C. OTTO, for appellees.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

This appeal is from a decree of the circuit court of Cook county dismissing for want of equity a bill filed by St. Louis Estes to contest the will of Joseph A. Marshall, who died on July 30, 1920, at LaGrange, Illinois, where he had lived for many years. He was twice married. Both his wives died before him and he left no child or other descendants surviving. He was first married in 1866 to a widow having a daughter, who afterward had a daughter of her own, Fannie Ritchie Snyder. This grand-daughter of the first wife of the testator was between two and three years old when her mother died, and from that time she lived in the testator's family until her marriage, in 1888 or 1889,

to Jason C. Clark. She and her son, J. Mortimer Clark, are the sole beneficiaries under the will in question, which recites: "The said Fannie Clark is the grand-daughter of my first wife and was raised by me and I have always looked upon her as a member of my family." A year and a half after the death of the testator's first wife he married, in 1893, Mrs. Medora Estes, who was the mother of a grown daughter and a younger son, who with their mother after the marriage resided with the testator. The mother died in 1915, and the daughter, Mabel, continued to reside with the testator until January, 1918. She suffered a stroke of paralysis in 1916, which rendered her helpless and confined her to her room at the testator's home until a few days before her death, when she was removed to the county hospital, where she died ten days later. The son, St. Louis Estes, became a dentist, married, and afterward lived with his family apart from the testator.

The will devised all the testator's property to the Chicago Title and Trust Company as trustee, and directed that the net income from the estate should be paid to Fannie Clark during her life and upon her death all the trust estate should become the property of Mortimer Clark. The will mentioned the complainant in the following language: "I give nothing to my step-son, St. Louis Estes, for the reason that I have abundantly provided for him heretofore." The complainant not being an heir of the testator, the bill, to show that he was a person interested and so entitled to file the bill, alleged the execution of two prior wills of the testator,—one in 1907, the other in 1915,—in both of which Estes was a beneficiary. The execution of these wills was not admitted, but no issue as to the complainant's interest was submitted to the jury, though he introduced evidence of the execution of the wills and the soundness of mind of the testator at the respective times of their execution. The grounds of contest alleged were the undue influence of Fannie Clark and mental incapacity of the tes-

tator. Issues of fact were submitted to a jury, upon whose verdict finding the instrument to be the last will and testament of Joseph A. Marshall the decree appealed from was entered.

The appellant contends that the verdict is manifestly against the weight of the evidence. The testator was born in 1840, enlisted as a private at the beginning of the civil war, was promoted from time to time, and was mustered out as a captain in 1865. He had accumulated considerable property, and at the time of his death was the owner of ninety-eight shares of the capital stock of the Chicago Title and Trust Company, a lot in LaGrange worth $6000 or $7000, and his home there, besides a half interest in a mining claim in Colorado, the value of which does not appear. His property was incumbered for an indebtedness of $23,000, and he received a pension from the government. The income from his property was probably consumed by the payment of interest on his indebtedness and his taxes. Apparently he had been fairly educated. He was a member of the Masonic order and of the Grand Army of the Republic post. He held the office in the Grand Army post of patriotic instructor, and he presided and spoke at many meetings in the public schools and elsewhere, usually on patriotic subjects. He was regarded as a speaker of ability and eloquence. After the death of his wife, in 1915, he continued to live in the house which they had occupied. After Mabel Estes was stricken with paralysis she remained a helpless invalid until her death. A colored girl, Paralee Payne, was employed to care for her. Mabel occupied a room up-stairs in the house and Paralee was in constant attendance on her. Her duties were confined to caring for Mabel. She was not a nurse and had no knowledge of the duties of caring for a sick person. The care of the rest of the house was left to the testator, who was obliged to be his own cook as well as housekeeper. He was an old man, with a small net income after payment of the

charges on it, and the testimony of the witnesses who expressed an opinion that he was of unsound mind is based almost entirely on the evidence of lack of proper care of the house and of his dress and person, his miserly practices and his offensive personal habits. Some of the witnesses characterize his kitchen, dining-room and bed-room, and the bed-room of Mabel Estes, as being filthy, and his person and clothes by the same term. He was penurious. He ate greedily, soiling his clothes with food which dropped from his mouth and making no effort to clean them. His hair was long and unkempt, he frequently went unshaven, and he was economical in the use of water, sometimes washing four or five times in the same bowl of water, and his habits were disgusting. These things do not, however, show that he was of unsound mind; and in connection with the fact that he managed his property, paid his interest, understood and appreciated his financial condition, sold a part of his property, refusing to sell more because he believed that it would advance in price, (as in fact actually happened,) it can hardly be said that the evidence tends to prove unsoundness of mind. Eccentricity, miserliness, uncleanness, slovenliness, neglect of person and clothing, offensive and disgusting personal habits, do not constitute unsoundness of mind. There is nothing in all the record to indicate that the testator did not know fully what property he owned, what it was worth, and his financial condition, or that he was not fully aware of his relations to those who might be presumed to have some claim upon his consideration in the disposition of his estate. It is not necessary to go into a statement, in detail, of the testimony of the various witnesses. Its character has been sufficiently indicated. The testator had many offensive and disagreeable habits, but the record is barren of anything else to show that he did not have the capacity which the law required to enable him to dispose of his property by will to those whom he desired to have it.

The charge of undue influence rests upon the testimony of Paralee Payne. She testified that a number of times between September and the latter part of December, 1917, Mrs. Fannie Clark and John C. Fetzer visited the testator and importuned him to make a new will. They had an argument, and Mrs. Clark and Fetzer told him that if he did not do this they would have him put in some place. They wanted him to sign the new will, but he said he would not do it, and it was too bad that in his old age he would be forced to do things he was not willing to do; that no one ought to expect a man to give everything to somebody that was not anything to him, in preference to somebody that was something to him. She testified that after they were gone the testator would be so mad he would tell her all about it. Fetzer testified, and denied that any such conversation as Paralee described ever occurred. Fetzer had been in the real estate business in Chicago for thirty years, was treasurer of the Hinsdale State Bank in 1918, and at the time of the trial was a Christian Scientist practitioner. There is nothing in the record to discredit his testimony, while the cross-examination of Paralee shows an almost complete lack of memory as to many circumstances in her life, and her story, even uncontradicted, is of itself not of such a character as to inspire confidence in its truth.

The appellant filed a petition for the appointment of a conservator for the testator on January 14, 1918. On January 30 the testator called on William A. Barnes, a lawyer living in LaGrange, with a copy of the summons which had been served on him. He said that he wanted a will prepared and would like to have it done that day. Barnes dictated the will, it was written out, the testator came in and the will was read over to him, but he took it away without signing it, saying that he would see Barnes again about it. He came in the next day with the will, in which he had made some interlineations, and asked to have it re-written. Barnes arranged to meet him on Saturday evening at the

LaGrange State Bank, which was open on Saturday evenings. The will was re-written and was delivered to the testator at the bank, where it was executed in the presence of the president and the cashier of the bank, who signed as subscribing witnesses. There was a trial later on the petition for the appointment of a conservator, and on April 10 there was a verdict of the jury finding the testator was not a feeble-minded person. These proceedings and the verdict were admitted in evidence on the trial of the issues on the contest of the will, and error is assigned on this action of the court, as well as in the admission of other evidence, over the appellant's objection. We have not overlooked these assignments of error, but it is unnecessary to discuss them, in view of our conclusion that the jury would not have been justified by the evidence, without regard to that which was objected to, in rendering any other verdict than that which they did, finding the instrument to be the will of the testator.

The decree will be affirmed. *Decree affirmed.*