(No. 16698.—Decree affirmed.)
FRANCIS BELZ, Appellant, *vs.* LOUIS H. PIEPENBRINK, Exr.,
*et al.* Appellees.

*Opinion filed October 28, 1925—Rehearing denied December 3, 1925.*

1. WILLS—*what does not determine testamentary capacity.* The belief of a person upon religious or political questions cannot be made a test of his sanity or testamentary capacity.

2. SAME—*question of testamentary capacity is for the jury— review.* The question whether or not a testator had sufficient testamentary capacity, as shown by the proof in a will contest, is for the jury to decide, and where the testimony is conflicting it is the special province of the jury to determine its weight and correctness; and the verdict of the jury, when approved by the trial judge, should not be disturbed by a reviewing court unless the record clearly shows it is contrary to the weight of the evidence.

3. SAME—*value of adjudication of insanity as evidence in will contest.* The record of an adjudication of insanity, when properly introduced in evidence in a will contest, is not conclusive on the question of the testator's sanity when he made his will but is to be considered by the jury for what it is worth.

4. SAME—*when testimony of subscribing witnesses is sufficient notwithstanding improper affidavits.* Although the affidavits of subscribing witnesses as introduced in evidence in a will contest recite that they "believe," and not that they "believed," the testator was of sound mind and memory, the introduction of the affidavits cannot, alone, have a prejudicial effect upon the contestant's case where proper proof is made by the testimony of the subscribing witnesses themselves at the trial.

5. SAME—*when witnesses may express opinion of testator's mental capacity.* Witnesses who have related their respective business dealings with the testator or their association and acquaintance with him, thereby showing their opportunity of becoming able to form and have an opinion as to his mental capacity, are competent to express such opinion on the trial in a will contest.

6. SAME—*what testimony of declarations of testator is competent.* The declarations of the testator, made either before or after the execution of an alleged will, as to his testamentary intentions, are competent on the question of his testamentary capacity; and it is not error to allow an attesting witness to testify that the testator

showed the witness a pencil draft of his will which was almost identical with the will in the disposition of the property, and that the testator said it was his will and asked the witness what he thought of it.

APPEAL from the Circuit Court of Will county; the Hon. FREDERICK A. HILL, Judge, presiding.

FRANK J. WISE, and WILLIAM C. MOONEY, for appellant.

FRANK J. JONES, and MARTIN & MARTIN, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

Appellant filed his bill in the circuit court of Will county during March, 1923, to contest the will of his brother, Augustus J. Belz, (alias Bells,) on the ground that the testator did not have testamentary capacity at the time of the execution of the will. Answers were filed by the several parties in interest and a trial had before a jury, which returned a verdict finding in favor of the proponents of the will. Motion for a new trial was overruled and a decree entered dismissing the bill for want of equity. From that decree appellant has prosecuted an appeal to this court.

Some of the material facts developed upon the trial were, that Augustus J. Belz, or Bells, a native of Will county, Illinois, died at St. Joseph's Hospital, in Joliet, on Tuesday, December 13, 1921, at the age of seventy-eight years. He had been married about 1870 and four children were born of this marriage, all of whom died in infancy. He was divorced from his wife about 1882. At the time of his death his only surviving heirs were his brother, who is appellant here, and three children of a deceased sister. During November, 1886, the testator was found insane by the verdict of a jury in the county court of Cook county and an order of commitment was entered by the county court. The verdict of the jury recited that he was then forty-four years old, and that his disease was of about three

318—34

months' duration, brought about by business troubles, and was not hereditary. The court order recited that he be committed to a State hospital for the insane and pending his admission thereto he be committed to the Cook County Insane Asylum. The record does not disclose the length of time deceased was confined, nor did any witness, except one, know, prior to the death of the deceased, that he had ever been adjudicated insane. This one witness testified he had been told of deceased having been adjudged insane, and that deceased had told witness of running away from the Dunning asylum. The Belz family owned property on Bluff street, in Joliet, near the canal. The testator lived with his mother there forty years ago and continued to live in the same house for two years after her death. He then moved into smaller quarters on or near the same premises, and with the exception of a short time, during which a brother lived with him, he lived alone in the same property, doing his own cooking and household work, until about three weeks before his death. He was the owner of different pieces of real estate in Joliet, most, if not all, of which appears to have been inherited by him from his father and brother. He built a house or two upon some of his property and rented the buildings which he owned. During 1917 he sold six lots for $9500 and handled the transactions himself. At the time of his death he owned a small amount of household effects, something over $900 in money and real estate valued between $30,000 and $35,000. He became ill about December 1, 1921, and was taken from where he lived, on Bluff street, to the house of his nephew, where he was under the care of a doctor and a practical nurse for five or six days, when he was removed to the hospital, where he died. The will in question was executed in the testator's room at the hospital on Saturday afternoon, December 10, 1921, in the presence of John T. Clyne, vice-president of the Commercial Trust and Savings Bank of Joliet, his son, James V. Clyne, an officer of the same bank,

both of whom were attesting witnesses to the instrument, and Louis H. Piepenbrink, who had possession of the will prior to its execution and had brought the other two persons to testator's room for the purpose of witnessing the will. The instrument was read in full by Piepenbrink to testator in the presence of the two witnesses just named. The testator called for a pen, said he was ready to sign it, and affixed his signature thereto. The will was probated in March, 1922, and letters testamentary issued to Piepenbrink. By the provisions of the will, after directing that his remains be cremated and all his just debts be paid by the executor, who was named in the will, the testator gave to his heirs-at-law his household goods, furniture, watch and jewelry, which were later appraised at $38.80, and all the remainder of his property, estimated at from $30,000 to $35,000 in value, he gave in trust to the board of school inspectors of district No. 86 of Will county, the net income therefrom to be used for the purpose of providing two substantial and wholesome meals each day at the different schools in said district for indigent pupils who are financially unable to pay for such meals, or whose parents, or those charged with such pupils' support, are unable to pay for the same.

Counsel for appellant contend the verdict of the jury is contrary to law and against the weight of the evidence, that the court erred in the admission and exclusion of evidence and in the giving and refusing of instructions.

On the trial appellees offered in evidence the testimony of twelve witnesses, none of whom had any financial interest in the suit nor were they in any way related to or connected with any of the parties interested. The two subscribing witnesses to the will were bankers residing in Joliet, one of whom had known the testator for twenty-five years, had visited with him at the bank at different times, thought him well read, that he had a good memory, was informed on current events, and witness usually learned something in

his talks with him. This witness testified concerning the execution of the will by the testator at the hospital, and related that about six weeks prior to his last illness he came to the bank and presented witness with a pencil draft of his will. He asked witness to read it over and say what witness thought about it. Witness expressed himself as not liking it very well and that it was not the kind of a will deceased should make. Deceased replied he knew what he was doing and was going ahead with it. The substance of the provisions of that pencil draft was substantially the same as the will executed by the testator. Witness further testified that during his entire acquaintance with testator the latter knew what he was doing, what he wanted to do, and was capable of transacting ordinary business. The other subscribing witness testified he had known deceased for many years, related the circumstances surrounding the execution of the will, and was of opinion that the testator was of sound mind and memory at the time of signing the will.

Two witnesses engaged in the plumbing business and two building contractors testified to having done work for testator between the years 1914 and 1919. The substance of this testimony was that deceased looked after his property, superintended the work on his houses when it was being done, was a close dealer, and usually paid his bills by check. A real estate and insurance man testified he had known deceased thirty-five years, had handled all of the insurance on his properties, and in 1917 bought six lots from him for $9500, and that deceased represented himself in the deal. Two former tenants of Belz testified about renting property from him covering a period of time from in 1918 to August, 1921, paying the rent, and the issuance of receipts therefor by deceased. A shoe merchant testified he had known Belz for fifteen years; that he saw him on an average of three times a week, and last saw him about two weeks before his death. Their visits were sometimes

long. Witness and deceased were both socialists, and they exchanged books and periodicals on the subject and talked about it frequently. A baker, who owned a place of business a short distance from where deceased lived, testified he knew him fifteen or twenty years and saw him most every day; that they visited and talked about business. Witness thought him a smart man. During his last illness witness visited him once at the Bray home and twice at the hospital. The cashier of the Joliet National Bank related having loaned money to deceased about tax-paying time during the years from 1912 to 1921. He stated deceased had a bank account at witness' bank, and witness never even had a suspicion that he was of unsound mind. All of the witnesses for appellees believed deceased was of sound mind during the times they knew or transacted business with him, covering a period of time from thirty-five years to within two or three days of his death, and that the condition of his mind when they last saw him was the same as it always had been. None of appellees' witnesses ever knew of deceased having been adjudged insane.

Appellant offered the testimony of six witnesses, one of whom was the doctor who attended deceased professionally during his last illness. He stated he had known deceased for about twenty years and was one of several residents of Joliet who in previous years used to gather at Bray's drug store, where deceased also came, and arguments were frequently started on some topic for the purpose of causing Belz to talk and argue for their entertainment. Witness said deceased had a delusion about politics and religion, was positive in his beliefs and statements, excitable, argumentative, and contradicted everybody. The doctor testified he had been asked by a nephew of Belz to go and see the latter when he was last sick; that he had the patient moved to the nephew's home and then to the hospital. He also told of the weakened condition of deceased, and of his complaining at the hospital of lack of sleep, pain in the abdo-

men and shortness of breath. He stated that on Sunday (which was the day after the will was made) deceased asked for a gun with which to shoot himself, or for poison, and repeated the request for poison on Monday. The doctor said he formed his opinion that Belz was of unsound mind twenty years ago, and his last illness made his mental condition worse. He further stated he treated deceased for the two weeks of his last illness but never fully determined his trouble. Another doctor, who was city health commissioner, testified about having some difficulty with deceased about 1915 because witness had forbidden persons using water out of a contaminated spring located on his premises. Two other witnesses, one of whom knew about deceased having been formerly adjudged insane, testified about their acquaintance with him and told of his unusual religious belief. Another witness, who was a son of appellant, testified he had visited his uncle about twice a week for five years preceding his death, and saw him very frequently during his last illness at the home of deceased, at Bray's home and at the hospital. He told of his failing physical condition, and said he thought he was of unsound mind after Sunday night before he died. In addition to the testimony of the six witnesses produced by appellant there was introduced in evidence the transcript of the proceedings from the county court of Cook county showing deceased to have been adjudged insane in 1886.

It will be seen the testimony of the witnesses on the question of mental capacity is not in full accord, though the proof offered by appellees' witnesses, if believed, clearly shows that at the times related by them deceased was capable of and did transact his ordinary business affairs. His business ability was not refuted by appellant in any way. It has often been held that one possessing mental capacity to transact ordinary business has sufficient testamentary capacity. *Ring* v. *Lawless,* 190 Ill. 520; *Chandler* v. *Fisher,* 290 id. 440; *Carnahan* v. *Hamilton,* 265 id. 508.

The belief of a person upon religious or political questions cannot be made a test of his sanity. (*Carnahan* v. *Hamilton, supra.*) The question whether or not the testator had sufficient testamentary capacity, as shown by the proof offered on the trial, was one for the jury to decide. Where the testimony is conflicting it is the special province of the jury to determine its weight and correctness. The verdict of a jury, when approved by the trial judge, should not be disturbed by a reviewing court unless the record clearly shows it is contrary to the weight of the evidence. (*Carney* v. *Sheedy,* 295 Ill. 78; *Blackhurst* v. *James,* 304 id. 586.) We are unable to say the evidence is insufficient to warrant the conclusion reached by the jury and approved by the trial court. Appellant says the judgment of the county court finding Belz insane in 1886 not having been rescinded, reversed or otherwise legally superseded, as provided by the next to the last sentence of section 11 of chapter 85, (Cahill's Stat. 1923,) is conclusive of his continued mental condition. Such a record, when properly introduced in evidence in a will contest, is not conclusive on the question of insanity at the time of making the will but is to be considered by the jury for what it is worth. *Holliday* v. *Shepherd,* 269 Ill. 429; *In re Estate of Weedman,* 254 id. 504.

Appellant contends the affidavits of the two subscribing witnesses should not have been admitted in evidence when objections thereto were made, because the affidavits, dated March 10, 1922, do not comply with section 2 of chapter 148, in that the word "believe" was used instead of "believed." Both of the subscribing witnesses testified at length on the trial as to their acquaintance and association with the testator covering a long period of years prior to the execution of the will. The testimony of one of the subscribing witnesses clearly manifests his belief in the testator's soundness of mind at all times during his acquaintance of twenty-five years. The evidence given by the other

subscribing witness shows, to our minds, that he always thought the testator was of sound mind. If the affidavits were defective in the use of the word "believe" under the holding of *Britt* v. *Darnell,* 315 Ill. 385, their introduction, alone, could have had no prejudicial effect upon appellant's case in view of the fact that the same proof was made in more thorough detail by the subscribing witnesses themselves at the trial. The testimony of witnesses for appellees who related their respective business dealings with decedent or their association and acquaintance with him, thereby showing their opportunity of becoming able to form and have an opinion as to his mental capacity, was competent and properly permitted on the trial. *Snell* v. *Weldon,* 239 Ill. 279; *Speirer* v. *Curtis,* 312 id. 152.

Appellant complains of the court's refusal to exclude from the jury the testimony of one of the subscribing witnesses relative to deceased showing to witness, about six weeks before the death of deceased, a pencil draft of his will which was almost identical in the disposition of his property as the will here involved. The deceased at the time said it was his will, and wanted the witness to read it and say what he thought of it. The declarations of a testator, made either before or after the execution of an alleged will, as to his testamentary intentions, are competent on the question of his testamentary capacity. *Hurley* v. *Caldwell,* 244 Ill. 448; *Kellan* v. *Kellan,* 258 id. 256; *Kimber* v. *Kimber,* 317 id. 561.

It is also urged by appellant that the court erred in giving and refusing instructions. We have examined all the instructions, and those given by the court, considering them as a series, advised the jury sufficiently and correctly upon the law applicable to the case. We see no prejudicial error in the instructions given to the jury.

The decree of the circuit court will be affirmed.

*Decree affirmed.*