CHARLES R. PENDARVIS, Exr., *et al.* Appellees, *vs.* DAVID
A. GIBB, Conservator, *et al.* Appellants.

*Opinion filed December 21, 1927.*

1. WILLS—*what constitutes testamentary capacity.* To have
testamentary capacity a testator does not have to be absolutely of
sound mind and memory in every respect, but all that is required
is that at the time of executing the will he have sufficient mental
capacity to comprehend and remember who are the natural objects
of his bounty, to comprehend the kind and character of his prop-
erty and the particular business in which he is engaged when mak-
ing a will, and to make a disposition of his property among his
relatives according to some plan formed in his mind.

2. SAME—*when decree in will contest will be reversed.* Where
the verdict of the jury is clearly and manifestly against the weight
of the evidence a court of review will reverse a decree in a will
contest case finding mental incapacity of the testator.

3. SAME—*what does not constitute unsoundness of mind.* Ec-
centricity, uncleanliness, slovenliness, neglect of person and cloth-
ing and offensive and disgusting personal habits do not constitute
unsoundness of mind.

4. SAME—*habitual use of intoxicating liquor may be considered
on the question of testamentary capacity.* The use of intoxicating
liquor does not have the effect of rendering a person incompetent
to execute a will unless it produces intoxication at the time of
making the will, but evidence that the testator was addicted to the
habitual use of intoxicating liquor is competent on the question of
mental ability.

5. SAME—*appointment of conservator is not conclusive that tes-
tator lacked testamentary capacity.* The fact that a conservator
had been appointed for a testator is not conclusive on the question
of the testator's mental ability to make a will but it is proper to
be considered in connection with all the other evidence in the case.

6. SAME—*insane delusion of testator, to avoid will, must affect
disposition of property.* It is not every insane delusion that will
avoid a will but to have such effect the insane delusion must affect
the testamentary disposition of the property; and even if the tes-
tator has an insane delusion on certain subjects, causing witnesses
to testify that they believe he was of unsound mind, still if he has
mental capacity to know his property, the objects of his bounty and
to make a disposition of his property according to a plan formed by
him the will cannot be set aside on the ground of mental incapacity.

7. SAME—*the complainants must establish charge of mental incapacity by preponderance of evidence.* Where the bill in a will contest charges lack of testamentary capacity, the burden is on the complainants not only to overcome by the preponderance of the evidence the *prima facie* case made by the proponents based upon the testimony of the subscribing witnesses to the will, but to prove by the preponderance of the evidence that the testator was mentally incapable of making a will at the time it was executed.

APPEAL from the Circuit Court of Henderson county; the Hon. GEORGE C. HILLYER, Judge, presiding.

J. W. CLENDENIN, E. P. FIELD, and SCOFIELD & BELL, for appellants.

L. H. HANNA, and HARTZELL & WERTS, for appellees.

Mr. COMMISSIONER PARTLOW reported this opinion:

On August 31, 1921, John B. Harbison, eighty-four years old, executed his last will and testament. At that time he owned 350 acres of land in Henderson county, Illinois, valued at $42,000, and had $5000 in personal property, consisting of cash, bank stock, Liberty bonds and corn. The will directed that all of his property should be converted into cash within thirty months after his death, and he gave his executor authority to make the necessary deeds and transfers. It directed the payment of his debts and funeral expenses; the erection of a monument at his grave, not to cost more than $1000; gave to the Ellison Cemetery Association, or its trustees, $1000, to be held in trust, the interest to be used every year toward the up-keep of the association; gave $500 to the Smithshire Methodist Episcopal Church and $500 to the Media Methodist Episcopal Church, to be used in any manner the trustees might desire. The sixth paragraph gave to L. L. Tinsman, who had been the family physician of the testator, $3000, and gave $500 to each of twelve persons specifically named, with the following statement: "The bequests made to various persons

named in the paragraph sixth of this my last will and testament are made as slight recognition of kindness shown to me during my lifetime." The seventh paragraph gave the testator's brother, William B. Harbison, $100; and the eighth paragraph gave to his nieces, Ruth E. Bigger and Ellen Shook, $250 each. The ninth paragraph provided that all that portion of the estate left after the fulfillment of the above provisions of the will should be divided equally, share and share alike, among the testator's nieces and nephews living at the time of his death, who are the children of his sisters and brothers, all deceased, named as follows: Eliza Fort, Jane Oglesby, Louis Harbison and James Harbison. The tenth paragraph appointed James Milligan, of Smithshire, Illinois, as executor of the will. The testator died March 25, 1923. The will was admitted to probate by the county court of Henderson county. William B. Harbison, the only brother of the testator, and six of his nieces, filed their bill in the circuit court of Henderson county against the other heirs-at-law and the legatees to contest the will. The jury found that the instrument in question was not the last will and testament of the testator, a decree was entered setting aside the will, and an appeal has been prosecuted to this court.

The bill alleged several grounds of contest, but the only one having any evidence to support it is that the testator at the time the will was executed was of unsound mind and memory and incapable of making a will. Appellants insist that the verdict of the jury in this respect is contrary to the manifest weight of the evidence, and that is the principal question raised on this appeal.

For about forty years the testator had lived on his farm, five miles southeast of Biggsville, in Henderson county. Up to within a few years prior to his death he had operated his farm, but for several years prior thereto he had rented it for cash and grain rent. He had three brothers and two sisters, all of whom had died leaving children except Wil-

liam, who survived the testator. There were eleven nieces
and nephews, six of whom were complainants and five were
defendants. Some time prior to the execution of the will
the testator had broken his hip and had never fully recov-
ered therefrom. He was lame and it was difficult for him
to walk or to get about without assistance. As a result he
stayed at home and did not go out very much or mingle
with people. He was in poor health, his eyesight was bad
but he never wore glasses. He never was married, and
the greater portion of the time he lived alone on his farm.
Some of his relatives visited him and helped him at irregu-
lar intervals and others paid no attention to him whatever.
Occasionally various men stayed with him for short inter-
vals and helped take care of him. Frequently men friends
from the neighborhood and from the surrounding towns
met at his home at night to play cards and drink whiskey.
The testator seldom, if ever, joined in the games but he
did drink whiskey, and there is evidence that he at times
became intoxicated. Some of these persons helped him by
bringing in coal and water and they did chores about the
place. He liked to have them come, and this was about his
only diversion. He remembered some of them in his will
by bequests of $500 each, as stated in the sixth paragraph.
On account of his crippled condition, poor health and no
one to assist him, his home and person became filthy and
there was a bad odor in the house and about his person.

The testator's brother, William, who was about two
years older than the testator, was also a bachelor. He
owned 280 acres of land in one place and 60 acres which
adjoined the land of the testator on the south. This land
was worth $40,000, and the brother had personal property
of the value of from $5000 to $7000. The two houses
were about three-quarters of a mile apart and yet the
brothers seldom visited each other. The brother died July
1, 1924, after the death of the testator and after the bill
was filed to contest the will. After the death of the brother

his executor was substituted as a complainant. On August 23, 1921, before the will was executed, the brother instituted proceedings in the county court of Henderson county to have a conservator appointed for the testator. David A. Gibb was appointed conservator, and he is a party defendant to these proceedings and is administering the estate.

. The will was drawn by James Milligan, who was the cashier of the Smithshire State Bank, where the testator did most of his business. The evidence does not show the circumstances under which the will was drawn. It was witnessed by A. R. Edwards, a farmer who lived one and one-half miles northeast of Smithshire and three miles from the testator. Edwards was a director of the Smithshire bank and was a member of the Smithshire Methodist Episcopal Church, to which $500 was bequeathed. He had known the testator all his life. The other witness was J. C. Kingsland, a retired farmer who lived in Smithshire. He was a stockholder and afterwards a director in the Smithshire bank. On the day the will was made Milligan and Kingsland went in an automobile to the home of Edwards and the three then went to the home of the testator. Edwards and Kingsland waited in the yard a short time and Milligan went into the house. Milligan then called them into the house, and after some conversation with the testator the will was executed in all respects as provided by law.

Milligan, the executor, died on August 25, 1922. Two or three weeks after his death the testator went to the Smithshire bank, of which Neil F. Norman was then the cashier. He had previously made arrangements through Norman to meet Judge J. W. Clendenin at the bank. The testator spoke to Norman about the death of Milligan, and stated that they had been friends for many years and he had depended quite a lot on Milligan. He asked Norman who would succeed Milligan as executor. Norman told him he would ascertain from his attorney, who would soon be

there. After Clendenin arrived the testator asked Norman for the will. Norman got it out of the vault and gave it to the testator and he and Clendenin had a conversation with reference to it. Later the testator said, in the presence of Norman, that he was satisfied. Clendenin said, in the presence of the testator, that he had explained to the testator that because of the death of Milligan, Gibb, the conservator, would administer upon the estate. The envelope containing the will was then delivered to Norman, who returned it to the files in the bank, where it remained until after the death of the testator, when Norman delivered it to the conservator.

On behalf of appellants sixteen witnesses testified that the testator was of sound mind and memory. The time covered by this testimony was from two to three years prior to his death, up until the time of his death. Four of these witnesses had known the testator all of their lives, four had known him over thirty-five years, two had known him twenty-eight years, and two had known him from fifteen to twenty years. They were neighbors, friends, farmers, bankers, merchants, grain and stock buyers. Some of them had transacted various items of business with him; others had lived at his house for short periods and had helped take care of him. Some of them had seen him frequently and had conversations with him; others had not seen him very often but only at remote intervals. On behalf of appellees thirteen witnesses testified, five of whom were physicians. Of the eight non-expert witnesses called, six were not asked to express an opinion as to the mental condition of the testator and two testified that he was mentally unsound.

Dr. McAllister and Dr. Morrow, specialists in nervous and mental diseases, neither knew nor saw the testator. They each answered a hypothetical question embracing many facts in evidence, and each testified that, assuming the facts to be true as stated in the question, in his opinion the testator was of unsound mind and memory; that he

was afflicted with senile insanity of a paranoiac type; that the disease was progressive; that a person suffering from this disease was likely to be suspicious and distrustful, to make accusations against his associates and to believe they were tormenting and mistreating him; that it did not necessarily affect the physical condition; that it was the result of a general enfeeblement from the changes that take place in the tissues as the result of old age; that a person afflicted with this disease never entirely recovers. Appellants insisted that the hypothetical question put to these two witnesses contained many assumptions of fact which were not justified by the evidence and omitted other facts which should have been included; that both of the physicians testified that if any material assumption contained in the question was not true or was omitted, their answers might be subject to modification. We are of the opinion that there is much force in the contention that this hypothetical question did assume facts which were not sustained by the evidence and omitted other facts which should have been included, and for that reason the opinions of these two witnesses are not entitled to as much weight as they otherwise might have been.

Dr. Kimery attended the testator in February, 1917. He was again called on March 3, 1923, and saw the testator four times before his death, on March 25, 1923. He testified that he was weak, took no nourishment and his mind lapsed. In his opinion the testator was not of sound mind and memory at that time, which was over eighteen months after the will was executed.

Drs. Marshall and Babcock visited the testator on September 6, 1921, after the will was drawn and before the hearing for the appointment of the conservator. The purpose of their visit was to examine the testator at the request of some of his relatives so they might testify. They had never seen the testator before that time and were not acquainted with him. They were with him about two hours.

They talked with him about his early life, his property, his relatives and his health. Dr. Marshall testified that the testator gave him the names of his brothers and sisters and some of his nieces and nephews. He said he had 350 acres of land and had about 40 or 50 acres of it in wheat, but he was unable to tell how much corn he had. The doctor testified that the room where the testator was sitting was filthy, the house was dirty and full of flies, he was weak, there was some tremor in his hands and voice, his face was a dark hue and his eyes rather glassy. The doctor felt of his pulse, looked at his tongue, turned back his eyelids and looked into his eyes. He testified that the testator had sclerosis of the blood vessels, which were hard, indicating that disease; that the disease affected the mental condition. Dr. Babcock testified that there were no screens in the house; that the house was filthy; that the testator seemed weak and trembly; that at times his face would be livid and at other times pale; that he talked about the acreage of his land, his crops and relatives, and many other matters. They both testified that in their opinion he was not of sound mind and memory.

M. E. Nolan was the State's attorney of Henderson county at the time the conservator proceedings were tried. He filed the petition and received $500 for his services from the testator's estate. He testified that on September 3, 1921, after the petition was filed and before the trial, he went to the testator's house and talked with him about the weather, his health, his property and the kind of whiskey they were able to get. Nolan told him he had a nice farm, and the testator replied that he used to have; that he had a section of land at one time but only had 80 acres left; that they had taken it away from him—that the people in the trees had taken it away. Nolan told him he did not see any people in the trees, and the testator said they were there; that they were roasting a beef out there and had the beef hanging in the tree; that he had three yoke of

328—19

oxen but they had killed two and that there was only one left. Nolan told him that he had quite a lot of corn, and the testator replied that he had but could not sell it; it was not worth anything. The testator looked out of the window and asked Nolan if he did not see a woman on the gate-post with a little child, and Nolan said he did not see anything. The testator said, "Well, she will be back pretty soon." He told Nolan he did not raise any corn any more because the Indians tramped it down. On September 7, 1921, Nolan went back to see the testator in company with E. L. Werts, who is one of the solicitors in this case. There was some conversation about whether the testator knew Werts. At first he did not remember him but afterwards he said that he did remember him. He spoke about beeves being in the trees and people being around there, and said somebody had to take care of him to keep the people away—the people in the trees. He asked if they could not see them, and said they were killing beeves. Nolan testified that in his opinion the testator was not of sound mind and memory at that time.

Robert McDill, who was sheriff at the time of the conservator proceedings, testified that he had known the testator for forty years and met him frequently; that for five or six years before his death he saw him occasionally and had conversations with him. In August, 1921, he served the summons in the conservator proceedings. He found the testator in his kitchen, read the writ to him, and told him it was for the purpose of having someone appointed to help him in his business. The testator said they should have done that long ago. The testator said he did not know the sheriff, and the sheriff told him who he was, and even then the testator did not remember him. The testator said they ought to send somebody to help keep people away from there; that there were 200 or 300 people around the house nearly all the time. He asked the sheriff if he could not see them; there were lots of them

out there; they were destroying his trees and he did not like it; that they had been sawing beef out there and hung it up in one of the trees. McDill testified that the testator was not of sound mind and memory.

Several witnesses on behalf of appellees, including Dr. Marshall and Dr. Babcock, testified that the testator talked about people and beeves being in the trees and about seeing a woman and baby on the gate-post. Edwards, one of the witnesses to the will, testified that the testator spoke to him about looking up in the trees. He asked him if he saw anything in the trees. The witness looked and did not see anything. Kingsland, the other witness, testified that about the time they were ready to leave the testator's home after the will was executed, the testator said he had a lot of company around there and asked them if they saw those fellows in the trees out there; that he did not hear the testator say anything about butchering in the trees and he did not say anything about a woman on the gate-post with a baby. One other witness for the appellants testified to a remark along similar lines by the testator. The testator testified in the conservator proceedings and his evidence was introduced on the trial of this case. He testified that it looked to him like there were things out in the trees; that he did not know whether they were people or not; that his eyesight was bad; that it looked to him like they were butchering out in the trees around his place—looked like there were brush houses out there; that he did not see more than three or four.

There are other facts which might be stated but we do not think it is necessary to refer to them in detail. In arriving at our conclusion we have taken all of them into consideration.

In order to have testamentary capacity a testator does not have to be absolutely of sound mind and memory in every respect. (*Hutchinson* v. *Hutchinson,* 152 Ill. 347.) All that is required is that he have sufficient mental

capacity to comprehend and remember who are the natural
objects of his bounty, to comprehend the kind and char-
acter of his property, and to make a disposition of that
property among his relatives according to some plan formed
in his mind. (*Donovan* v. *St. Joseph's Home,* 295 Ill. 125;
*Dowdey* v. *Palmer,* 287 id. 42; *McLean* v. *Barnes,* 285 id.
203.) He must understand the particular business in which
he is engaged. (*Austin* v. *Austin,* 260 Ill. 299; *Johnson*
v. *Farrell,* 215 id. 542.) The test refers to the time of the
making of the will. (*Turckheim* v. *Birkley,* 287 Ill. 434.)
It is only where the verdict of the jury is clearly and mani-
festly against the weight of the evidence that a court of
review will reverse a decree in a case of this kind. (*Mc-
Grady* v. *McGrady,* 298 Ill. 129; *Daugherty* v. *State Sav-
ings Co.* 292 id. 147.) Eccentricity, uncleanliness, sloven-
liness, neglect of person and clothing, offensive and disgust-
ing personal habits do not constitute unsoundness of mind.
(*Estes* v. *Clark,* 317 Ill. 585.) The use of intoxicating
liquor does not have the effect of rendering a person in-
competent of executing a will unless such use is at the time
of making the will, but evidence that the testator was ad-
dicted to the habitual use of intoxicating liquor is compe-
tent on the question of mental ability. (*Moriarity* v. *Palmer,*
286 Ill. 96; *Ravenscroft* v. *Stull,* 280 id. 406.) The fact
that a conservator has been appointed is not conclusive on
the question of the testator's mental ability to make a will,
but it is proper to be considered in connection with all the
other evidence in the case. (*Belz* v. *Piepenbrink,* 318 Ill.
528.) It is not every insane delusion that will avoid a
will. In order to avoid a will the insane delusion must af-
fect the testamentary disposition of the property. (*Ameri-
can Bible Society* v. *Price,* 115 Ill. 623; *Owen* v. *Crum-
baugh,* 228 id. 380.) Even if the testator has an insane
delusion on certain subjects, still if he has mental capacity
to know his property, the objects of his bounty and to
make a disposition of his property according to a plan

formed by him, the will cannot be set aside on the ground of mental incapacity.

It is difficult to determine the exact extent of any delusion which the testator might have had with reference to seeing people in the trees. The evidence shows that he had bad eyesight and never wore glasses. The delusion, if there was one, may have been partly of the eye as well as of the brain. Most of the evidence on behalf of appellees is based upon this delusion. Apart from the evidence concerning this delusion there is very little evidence on which a charge of unsoundness of mind could be sustained. Even if it be conceded that the testator had an insane delusion in the respect claimed, the evidence does not show that it in any way affected or entered into the execution of the will. The burden of proof was on appellees not only to overcome by the preponderance of the evidence the *prima facie* case made by appellants based upon the testimony of the subscribing witnesses to the will, but the burden was on them to prove by the preponderance of the evidence that the testator was mentally incapable of making a will at the time it was executed. (*Britt* v. *Darnell,* 315 Ill. 385.) Sixteen witnesses testified for appellants that the testator was mentally sound, while seven witnesses testified for appellees that he was mentally unsound, two of whom never saw him and only answered hypothetical questions. Two did not know him and saw him only on one or two occasions after the will had been executed, and another saw him eighteen months after the will was executed and only testified to his mental condition at that late date. When we take into consideration the number of witnesses testifying, their opportunity for knowing the facts about which they testified, and the weight to be given to the evidence of each, the preponderance of the evidence shows that the testator was of sound mind at the time he executed the will.

The preponderance of the evidence shows that the testator knew who were the objects of his bounty. He knew

he had one brother living and two sisters who were dead, leaving children. He named over some of his nieces and nephews to Drs. Marshall and Babcock. He specifically named two of them in his will and none of them were omitted. The will stated that they were the children of his deceased brothers and sisters, who were named in the will. It is possible that he could not call each of these eleven nieces and nephews by name. One reason for this might have been that five of them were non-residents, the children of his sister Eliza Fort.

The preponderance of the evidence also shows that the testator knew the kind and character of his bounty to be bestowed. He knew the amount of land he owned and that he had some personal property. He rented the land and disposed of his share of the crops. He knew the names of the tenants to whom the land had been rented. He deposited his money in the bank and drew checks against it. A great many checks were offered in evidence. It is insisted that they were only signed by the testator and the body of them was in the handwriting of other persons. This might be expected, taking into consideration his age and eyesight. These checks indicate that he transacted his own business and that he paid by check for the things he bought. As far as the evidence shows he transacted his own business without the assistance of anyone, and there is no evidence that he was ever overreached in a single transaction. There is evidence that certain persons tried to sell him some oil stock and he refused to buy.

The preponderance of the evidence also shows that the testator made disposition of his property according to a plan of his own. He told various persons that he intended to make a will. He talked with his brother about it. He urged his brother to make a will. He said that each of them should leave $1000 to the Ellison Cemetery, where their father and mother were buried and where they themselves were to be buried. The brother replied that the

amount was too much. The testator told other witnesses that he was going to make a bequest to the cemetery association. He took some steps to buy a lot there and build a vault but did not complete the arrangements before his death. He, however, was buried on the lot which he bought during his lifetime and it was paid for after his death. He said he was going to remember in his will the persons who had been kind to him—his friends who had helped take care of him. He gave Dr. Tinsman, his physician, $3000. There is evidence that the doctor had not only taken care of the testator as a physician but had been kind to him and assisted him in various ways. Three of the twelve gifts of $500 each in the sixth paragraph were to Mrs. David A. Gibb, wife of the conservator, and to Clarence and Marshal Gibb. The evidence shows that Mrs. Gibb had on different occasions been at the testator's house, had helped clean the house, and had sent him various things to eat. Her sons brought in coal and water, did chores for him and ran errands. Some of the other persons mentioned in paragraph 6 had visited testator in his lonesomeness, played cards with him, drank whiskey and gone to places with him. Ruth E. Bigger and Ellen Shook, two of his nieces, had visited him more than some of the other relatives, and he gave each of them $250 more than was received by the other nieces and nephews. He remembered all of these kindnesses and drew the will accordingly to reward those who were entitled to special consideration. The fact that he gave only $100 to the brother is in keeping with the facts. The brother was two years older than the testator. He had as much property as the testator. He had never been married and had no children. The heirs of each of the brothers were identical. The will, when considered as a whole, shows a rational and reasonable disposition of the estate under the facts in evidence. Because of the death of Milligan, appellants were unable to prove the circumstances under which the will was drawn. Dr. Tinsman,

who probably knew more about the testator's mental and physical condition than any other person, was an incompetent witness because he was one of the beneficiaries under the will. The other twelve beneficiaries under the sixth paragraph were incompetent for the same reason.

Appellees contend that the testator was in no mental condition on the day the will was executed to know what he was doing, and on that night locked himself in a room in his house and asked for an ax to protect himself. The strongest evidence that refutes this contention is that when Milligan died, almost one year after the will was executed, the testator immediately took steps to ascertain the effect of his death. He went to the bank where the will was kept, talked with the cashier and an attorney, and ascertained that the conservator would administer the estate. He was satisfied and took no steps to change the will. His action in this respect shows that he not only knew that he had made a will, but he knew where it was kept and who was the executor. He did what any mentally sound man would have done who did not know the legal effect of the death of the executor. These facts are not disputed. They were testified to by a witness who had no interest in the case and was apparently a man of the highest standing in the community.

Complaint is made of certain rulings on evidence and instructions, but it will not be necessary to consider any of them.

The preponderance of the evidence did not show that the testator was mentally incompetent to execute the will, and the decree of the circuit court will be reversed and the cause remanded.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded.*