(No. 24824.—                    )
WILLIAM J. SZARAT *et al.* Appellees, *vs.* JOSEPHINE SCHUERR, Appellant.

*Opinion filed April 14, 1939.*

290

WACHOWSKI & WACHOWSKI, (CASIMIR R. WACHOWSKI, and MICHAEL SIEMANSKI, of counsel,) for appellant.

MAXFIELD WEISBROD, and EUGENE BERNSTEIN, for appellees.

Mr. JUSTICE GUNN delivered the opinion of the court:

John F. Szarat, a resident of Chicago, died on May 15, 1935. An instrument apparently prepared by himself, dated April 3, 1935, purporting to be his last will and testament was denied admission to probate by the probate court of Cook county. The circuit court of Cook county, after a hearing *de novo,* affirmed the order of the probate court. This court, upon appeal, reversed the order of the circuit court and remanded the cause, with directions to admit the will to probate. (*Szarat* v. *Schuerr,* 365 Ill. 323.) This was done and letters testamentary were issued to Josephine Schuerr, as executrix, the co-executrix named in the instru-

ment having declined to act with Mrs. Schuerr. Thereafter, William J. Szarat and Marie Turner, the two children of the decedent, his only heirs-at-law, filed their bill of complaint in the circuit court of Cook county to set aside the instrument. The contestants charged that the purported will was not signed by the attesting witnesses in the presence of John F. Szarat; that he lacked testamentary capacity, and that his signature to the document was procured through the exercise of undue influence by the proponent, Josephine Schuerr. By her answer proponent denied the allegations of the complaint. At the conclusion of the contestants' evidence the chancellor granted proponent's motion to withdraw the issue of undue influence from the jury's consideration. Her motions at the close of all the evidence to exclude the evidence with respect to testamentary capacity and the due execution of the will were denied. The verdict found these two issues for the contestants. An amended motion for a new trial and a motion for judgment notwithstanding the verdict were made and denied, and a decree was rendered upon the verdict. Proponent, individually and as executrix of the instrument purporting to be the last will of John F. Szarat, prosecutes this appeal. The will devised real estate in fee and hence, a freehold is involved.

It is contended by appellant that the verdict on the issues of testamentary capacity and proper attestation was against the manifest weight of the evidence, and that the decree of the trial court should be reversed. Six witnesses testified in behalf of the contestants on the issue of testamentary capacity, and eight witnesses testified for the proponent on this issue.

Leland K. Baska testified in behalf of the contestants that, approximately two years prior to the testator's death, he noticed a change in him. Szarat started doctoring at that time. At times witness would have to throw an eraser at him in order to get him to turn to ask him questions.

He testified that sometimes he, Szarat, would talk on the telephone and be very nervous at the same time. At about the time he died, he would stand and look out of the window. He would sometimes stand and look out of the window and would not hear the telephone. He would have excuses to go home without doing his work. Baska was of the opinion he was not of sound and disposing mind and memory.

On cross-examination Baska admitted that in the probate court he was asked these questions and answered as follows: "Q. Did you believe him to be of sound and disposing memory at the time he acknowledged the instrument?" "A. I didn't notice any difference in him, but I knew he was doctoring." "Q. Did you believe him to be of sound and disposing memory at the time you saw him sign the instrument?" "A. He appeared all right to me."

In the circuit court, on the appeal from the probate court, Baska had previously testified in answer to this question: "The court: Did you believe that he was of—that he had sufficient mind and memory to understand the business that he was then engaged in and able to recall the persons who were the objects of his bounty and the property that he owned and the disposition he wanted to make of it? That is, the property?" "A. Yes, sir."

Daniel H. Ackerman testified that he had known Szarat twelve or fourteen years prior to his death; that for a period of twelve to eighteen months prior to his death he noticed a lot of difference in him, and that he seemed to be absent-minded. Szarat told the witness that he had a new apparatus consisting of a safety-pin on a line with which to catch fish; that he had an awful blank look at the last, and that there was something peculiar about his conversation. He would be talking on a subject and drift off to another one, and, in the opinion of the witness, he was not in his right mind.

Samuel A. Marrs testified that he had known Szarat for ten to twelve years; that when he saw him in the summer

and fall of 1934 there was a change in his physical and mental condition compared with previous years. He was kind of "starey." He noticed that Szarat did talk of one thing and then another. He would talk about fishing and then about hunting. He did not have an active step but dragged and scuffled his feet. There was a peculiar expression in his face. In the opinion of the witness, Szarat was not in his right mind the last time he saw him, in March of 1935, and, in his opinion, his mind was not as sound and perfect a mind as it had been previously. On cross-examination this witness testified that the reason he believed Szarat was not of sound mind was because he was not the same as he was before—that he was slipping. As to whether Szarat did recognize the people about him, witness said he did recognize him. Witness had no idea what his condition was on April 4, 1935, the day the will was executed.

Joseph S. Szarat, brother of the decedent, testified there was a noticeable difference in his physical condition as compared with the previous three or four years. He was sick physically. He couldn't carry on the same conversation that he always did. He testified that on one occasion, in March, 1935, the decedent called him on the telephone to come to the dog pound, and he did not remember calling witness when he came. He could not add accounts as he had previously, and would drift in his conversation. Witness noticed that he was a very sick man—had a deep cough. He testified that on April 3, at the dog pound, at night Szarat placed a bench against the door, stating that he did not want Josephine Schuerr to come in and catch the witness with him, as he did not want her to put a spell on him, the witness. He dragged his feet. Witness was of the opinion that Szarat was not of sound and disposing mind.

May Szarat, sister-in-law of the decedent, testified that, during the year prior to his death, she noticed a change in him physically and mentally. She testified that decedent was nervous. He said he felt terrible. At times he would

cry and, in the opinion of the witness, the decedent's mind was not sound.

Victoria Eicholz, sister of the decedent, testified that she saw the decedent two or three times in the month of July, 1934. In March, 1935, he agreed to meet the rest of the brothers at a meeting on Monday night. He did not come Monday night and came Tuesday night and stated he had his dates mixed up. He mumbled to himself. In her opinion his mind was not sound.

Gloria Royston testified in behalf of the proponents. She had met the decedent in the holiday season of 1934 and saw him about twice a month, thereafter. She was present the evening the will was executed and was of the opinion that he was of sound mind.

Bertha Trent, who had known decedent for about five years, was present at decedent's home at a party on April 4, 1935, the evening of the execution of the will. She was of the opinion that the decedent was of sound mind.

Dr. Anthony Stream, Szarat's family physician, who had known Szarat for thirty years, testified he saw the decedent in December of 1934, four times in January, 1935, and three times in February, 1935. He saw him on April 4, just prior to the execution of the will. Witness stated that the decedent did not talk on one subject and then drift to another; that the decedent was physically a little different than he had been but, mentally, he was no different. He was just nervous and run down physically, and that decedent's condition did not seem to affect his brain. In the doctor's opinion he was sane.

Dr. Walter E. Block took care of the decedent up until the time of his death. The decedent visited the doctor's office several times in February and April, 1935. His physical condition became worse and, on May 6, 1935, the doctor came to see the decedent at his home and suggested he go to a hospital for observation. On May 9, 1935, the wit-

ness told Szarat of his serious physical condition and that he might die shortly and advised him to settle his estate, and Szarat replied that he had already made his will and provided for people he mentioned in the will. Witness was present on May 15, 1935, the day of Szarat's death. Szarat talked about the making of his will and told him that Mrs. Schuerr had the keys, boxes and bonds. The doctor stated that at all times Szarat was of sound and disposing memory, and that his disease did not affect his mind.

Agnes Wiorek testified that she was a sister of Josephine Schuerr. She testified that she saw Szarat practically every day for the last two years of his life, and that she stayed in his home the last two weeks, night and day, before he died. Szarat told witness about making his will. Szarat was not confined solely to his bed, with the exception of the last day. She was of the opinion that he was sane at all times.

Magdalen Albrecht, daughter of Josephine Schuerr knew the decedent about seven years. She saw him about twice a week. She was present at a birthday party on the evening of April 4, 1935, the day the will was executed, where Szarat stated: "Well if Gabriel blows his horn tomorrow, I am all set, for I have just made my will." In the opinion of the witness, the decedent was sane.

Frank Najder was a real estate broker and knew decedent and the whole Szarat family for thirty years. He had a number of business transactions with decedent during a period of two years prior to his death, and saw him twice or three times a week. On May 9, 1935, witness was called by decedent to come over on an important matter. The decedent and Joseph Szarat were discussing fear of death, confession, expectancy of life, his mother's real estate, place of burial of decedent, etc. As Joseph Szarat left the room, decedent called him back and told him to come back later, alone. When he came back the decedent showed him vari-

ous papers, such as guaranty and insurance policies, and showed him a deed which had been executed, except for the grantee's name. The decedent then read the will and told the witness that the family wanted to break the will. The decedent instructed the witness to draw a quitclaim deed conveying the property to Josephine Schuerr so that in case the family broke the will, she would nevertheless get the Fox Lake property. After the deed was prepared, decedent read it over, said it was all right and signed it. The decedent then turned over all the papers to Josephine Schuerr, telling her they belonged to her. In the opinion of the witness, decedent was of sound mind.

George J. Bolton, one of the subscribing witnesses, testified that he had known the decedent over a period of years; that he had an absolutely normal conversation with the decedent immediately prior to the execution of the will; that he never talked on one subject and went off on a different subject, and that he believed the decedent to be sane.

In *Bailey* v. *Oberlander*, 329 Ill. 568, at page 572, the test of mental capacity was stated to be: "In order to have testamentary capacity a testatrix does not have to be absolutely of sound mind and memory in every respect. (*Hutchinson* v. *Hutchinson*, 152 Ill. 347.) All that is required is that she have sufficient mental ability to know and remember who are the natural objects of her bounty, to comprehend the kind and character of her property, and to make disposition of that property according to some plan formed in her mind. (*Donovan* v. *St. Joseph's Home*, 295 Ill. 125; *Dowdey* v. *Palmer*, 287 id. 42; *McLean* v. *Barnes*, 285 id. 203.) Physical and mental weakness due to old age will not necessarily render one incompetent to make a will. Although a woman may be physically and mentally weak, if she has sufficient mental ability to comply with the requirements above stated she is competent to make a will. (*Woodman* v. *Illinois Trust and Savings Bank*, 211 Ill. 578; *Pooler* v. *Cristman*, 145 id. 405.) She must understand the

particular business in which she is engaged. (*Austin* v. *Austin*, 260 Ill. 299; *Johnson* v. *Farrell*, 215 id. 542.) The test refers to the time of making the will. (*Turckheim* v. *Birkley*, 287 Ill. 434.) Eccentricity, uncleanliness, slovenliness, neglect of person and clothing, offensive and disgusting habits, do not constitute unsoundness of mind.—*Estes* v. *Clark*, 317 Ill. 585."

In *Applehans* v. *Jurgenson*, 336 Ill. 427, at page 436, it was stated: "A sound and disposing mind, in legal contemplation, is not inconsistent with a lack of perfect balance or a considerable degree of eccentricity. The testator, at the time he executes his will, must have sufficient mental capacity to know the natural objects of his bounty, to comprehend the kind and character of his property, to understand the nature and effect of his act, and to make a disposition of his property according to some plan formed in his mind.— *Bailey* v. *Oberlander, supra; Pendarvis* v. *Gibb*, 328 Ill. 282; *Donovan* v. *St. Joseph's Home*, 295 id. 125; *Dowdey* v. *Palmer*, 287 id. 42."

We believe there can be no question, under all the evidence, that Szarat had sufficient mental capacity to know the objects of his bounty and to comprehend the kind and amount of his property. We believe the evidence shows, beyond dispute, that he clearly understood the effect of his act of making his will, and had formed a plan in his mind of the manner of disposing of his estate.

In view of the foregoing, we are of the opinion that the verdict of the jury upon the issue of testamentary capacity is against the clear weight and preponderance of the evidence and will have to be set aside.

In regard to the issue of proper execution of the will, the evidence shows that the will was signed by the testator and was attested by two subscribing witnesses. It is undisputed that the signatures of all the parties are genuine. The attestation clause is in the following form:

"This instrument was on the day of date thereof signed, sealed, published and declared by the said testatrix John F. Szarat as and for his last will and testament, in the presents of us, who at his request and in his presence and in the presence of each other have subscribed our names as witnesses thereto.

"Subscribed and sworn to before me this 4th day of April 1935.
LELAND K. BASKA
Notary Public

8454 Danto Ave
Notary's Address
Chicago, Ill.

"Leland K. Baska 8454 Danto Ave. Witnesses.
J. George Bolton 7600 S. Sangamon St.
(Notarial Seal.)"

The evidence is clear that each of the signatures was placed on the document at the dog pound located at 3400 South Lawndale avenue, Chicago, Illinois, where Szarat and Baska, police officers, were assigned to duty. In the front of the building in which the dog pound was located there was a room through the center of which ran a counter, north and south, dividing the room into two parts. The counter, which was about waist high, was separated from the south wall by a swinging door. On the south wall of the east section was a door leading to the animal cages and to a lavatory. The east section was used by the public and the west section was used for office purposes. On the evening the will was executed, there were present Leland Baska, George Bolton and Gloria Royston. There is no dispute but that the instrument was signed or acknowledged by the testator in the presence of each witness, and there is no dispute but that the signatures of the testator and the witnesses are all genuine. The only point in issue in regard to the due execution of the will is whether the testator was in the physical presence of Baska at the moment Baska signed as an attesting witness. On this issue Baska testified that when the testator handed the instrument to the witness and requested him to sign it, that he put it in his pocket, and that Szarat walked out of the room several

times before he, Baska, signed it; that at the time he placed his signature on the document Szarat had gone through the doorway at the south end of the room and was out of the room.

At the time of the hearing in the circuit court, George Bolton, one of the attesting witnesses, had died, and his testimony, given at the hearing in the probate court, was read into the record. Bolton testified that he signed his name to the instrument at Szarat's request, and that he and Szarat saw each other sign.

Gloria Royston testified that she was in the room at the time Baska signed the will and that Szarat was about two and one-half feet from Baska; that after the will was signed by Baska, the testator took the will, folded it up and put it in his pocket.

The contestants' evidence in regard to improper execution is limited to the statement of Baska that the testator was out of the room at the moment he witnessed the will. The attestation clause signed by Baska certifies that the will was signed, sealed, published and declared by the testator as and for his last will and testament in the presence of witnesses, who at the testator's request and *in his presence* and in the presence of each other subscribed their names as witnesses. Baska's testimony is directly contrary to the fact of attesting in the presence of the testator, certified to by him in the attestation clause to the will. A number of witnesses testified that Baska had, subsequent to the execution of the will, admitted that he signed it in the presence of the testator. These statements were denied by Baska. It is to be noted that the testimony of Baska, relied upon by the contestants, is a positive denial of one of the facts certified in the attestation clause. From the testimony of Baska there was then only one element missing to make the will valid, viz., the presence of Szarat. He could be more easily mistaken on this fact than on that of seeing him sign. We think the evidence shows Szarat was present. Royston

testified he was; Baska certifies he was, and it would be extremely unusual, where the testator manifested such concern to have the will properly prepared, for a witness to affix his name twice, and both times in the absence of the testator.

In regard to such testimony, this court stated in the case of *Kuehne* v. *Malach*, 286 Ill. 120, at page 125: "Where the testimony of a living witness amounts to a positive denial of a certificate of attestation, the relative weight to be given the conflicting testimony would depend very largely on the apparent integrity and intelligence of the witnesses and the circumstances of each particular case. Where a witness who has subscribed to a will stating in the attestation clause all the facts required for a proper attesting of the will testifies on the hearing to a contrary state of facts, he thereby assumes an attitude which is not only inconsistent with the position that he has voluntarily taken but one that may well be argued to be suggestive of fraud and double dealing."

In *Beck* v. *Lash*, 303 Ill. 549, this court stated that an attesting witness cannot be too severely criticised for signing an attestation clause and then swearing to the contrary when he is produced as a witness in court.

In *Jenkins* v. *White*, 298 Ill. 502, it was held that the testimony of a subscribing witness who seeks to impeach the will should be received with caution when his testimony is conflicting, in itself, and is positively contradicted by other witnesses who appear to be credible.

In the present case, Baska's testimony upon the issue of testamentary capacity was highly contradictory. In the probate court he testified that in his opinion the testator was of sound mind. Again in the circuit court, on appeal from the probate court, Baska testified that, in his opinion, the testator was of sound mind. However, in the circuit court, in the contest proceedings, Baska testified that, in his opinion, the testator was of unsound mind.

In view of these and other contradictions in Baska's testimony, and in view of the fact that his testimony is directly contradicted by the attestation clause certified by him and by other credible evidence, we are of the opinion that the manifest weight of the testimony shows that Szarat was present when Baska and Bolton signed as witnesses to the will.

Upon the issue of due execution of a will in the circuit court the proponents may rightfully resort to any legitimate testimony to establish a will in chancery, (*Gould* v. *Chicago Theological Seminary*, 189 Ill. 282; *In re Will of Porter*, 309 id. 220;) and this may include statements or admissions made by the subscribing witnesses. *Kaul* v. *Lyman*, 259 Ill. 30.

It is contended by appellees that when the testimony of either side is such as, uncontroverted, would justify a finding either for or against the complainants, the reviewing court will not disturb the verdict and decree. This rule has no application in a case where the verdict is against the clear weight and preponderance of the evidence.

This court, in *McGrady* v. *McGrady*, 298 Ill. 129, at page 142, used the following language: "Not only did the appellants produce the greater number of witnesses, but their testimony was more satisfactory and convincing than that of the witnesses for appellees and their opinions were based upon a more satisfactory foundation. We recognize the rule that this court will not set aside a verdict which is not manifestly against the weight of the evidence, but giving the verdict of the jury and the decree of the chancellor, who heard and saw all the witnesses, the weight to which they are entitled, we still regard the verdict as manifestly against the greater preponderance of the evidence."

This rule was applied in *Pendarvis* v. *Gibb*, 328 Ill. 282, *Daugherty* v. *City Savings Bank*, 292 id. 147, *Sellers* v. *Kincaid*, 303 id. 216, *Munz* v. *Bort*, 307 id. 412, and numerous other cases.

As we have found that the verdict of the jury is against the clear weight and preponderance of the evidence on both the issue of testamentary capacity and due execution, the decree must be reversed and the cause remanded.

*Reversed and remanded.*